BOEHM *v.* CITY OF DETROIT.

141    277
f155    ⁶473

1. NEGLIGENCE—INJURIES TO CHILD—IMPUTED NEGLIGENCE.
   Where a child is injured by falling into a hole in a defective sidewalk while being led by the hand by his father, the negligence of the father in taking him over the walk is not imputable to the child and will not bar recovery by him.[1]

2. EVIDENCE—OPINIONS—HARMLESS ERROR.
   Where the exclamation, acts, and demeanor of a child fully establish the fact that he suffered great pain, the admission in evidence of the opinions and conclusions of witnesses that he suffered, if error, is not sufficiently harmful to work a reversal.

3. SAME—EXPERTS—CONCLUSIONS.
   An objection to the attending physician's testimony that plaintiff suffers from contraction of tissues "yet," as a result of the injury complained of, sustained some months before, is disposed of by subsequent testimony by the physician that he examined plaintiff two weeks prior to the trial.

4. APPEAL AND ERROR—ASSIGNMENTS—THEORY BELOW.
   Assignments of error based on grounds not presented by the objections below will not be considered.

5. EVIDENCE — EXPERTS — EXAMINATION — HYPOTHETICAL QUESTION.
   An objection that a hypothetical question is not based upon the testimony is unavailing where the answer is not based upon the question, but upon the physician's examination of plaintiff.

6. SAME—OPINION.
   In an action for injuries to a child by falling on a defective sidewalk, his attending physician may properly be permitted to testify that from his experience it is his opinion that the injury from which he found plaintiff to be suffering could be produced by stepping into a hole in a sidewalk and straining his leg.

[1]For contributory negligence of parent or custodian as bar to an action by child for negligent injuries, see note to *Chicago City R. Co.* v. *Wilcox* (Ill.), 21 L. R. A. 76.

7. SAME—OPINION—CAUSE OF INJURY.
> Where there is evidence that plaintiff was a healthy, robust
> child, with perfectly sound legs, immediately prior to the
> injury in question, and that an abscess formed after the in-
> jury, it is proper to show how the abscess might have been
> caused.                                            .

Error to Wayne; Hosmer, J. Submitted June 20, 1905. (Docket No. 37.) Decided September 19, 1905.

Case by Gordon E. J. Boehm, by next friend, against the city of Detroit for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*P. J. M. Hally* (*Timothy E. Tarsney*, of counsel), for appellant.

*Wesley L. Nutten*, for appellee.

BLAIR, J. The plaintiff, an infant, brought suit, by his next friend, against the city of Detroit for injuries alleged to have been received on the night of August 14, 1901, through a defective sidewalk. At the time of the accident the plaintiff was a little over four years old, and was walking over the sidewalk in question between his father and mother; his father holding him by the left hand. As they were going along, the child stepped into a hole in the sidewalk and fell with considerable force against his father. Plaintiff alleges in his declaration that by reason of this fall—

" The muscles, tendons, nerves, and ligaments of his right leg at or near the groin thereof were greatly and permanently injured, sprained, bruised, and wrenched, and the femur bone of said leg near the hip joint was bruised and permanently injured, and said leg was sore and lame, and so remained for a long time, to wit, from thence hitherto, and as a result of said injuries an abscess formed near the groin of said leg, which caused plaintiff great suffering, and said abscess was lanced, and the bone where the same had formed was scraped, and plaintiff is advised by his physician that abscesses are liable to

recur at said point. That said injuries have impaired the use of said leg, and caused plaintiff to favor the same, and plaintiff fears that his said leg is permanently disabled. That in consequence of said injuries plaintiff has suffered much pain, and his nervous system has been greatly shocked, permanently injured, and he has been obliged to undergo medical and surgical treatment at an expense of about seventy-five dollars."

It was conceded by counsel for the city that defendant was negligent, but it was insisted that no injury had come to plaintiff through such negligence; that there was no causal connection between the child's fall and the abscess. The trial resulted in a verdict for plaintiff, and defendant has brought the record to this court for review upon writ of error.

Defendant's counsel presented 20 assignments of errors, but have discussed in their brief and argument in this court only assignments numbered 1, 2, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16, which are as follows:

" 1. The court erred in refusing to strike out that portion of witness Boehm's testimony wherein he said: ' He was in awful pain and agony.'

" 2. The court erred in refusing to strike out that portion of the testimony of witness Boehm where he said: ' We could not hardly touch his leg.' * * *

" 6. The court erred in refusing to strike out that portion of witness Shields' testimony wherein he said: ' There is evidently contraction of these tissues yet.'

" 7. The court erred in permitting witness Shields to give an answer to the hypothetical question on page 27 of the record.

" 8. The court erred in remarking: ' It seems to me that two ounces of pus would show an injury of some kind.'

" 9. The court erred in using the following language: ' In the absence of any other cause for that, would you attribute it to stepping into the sidewalk, or would stepping through a hole in a sidewalk be likely to produce injuries such as you found the child suffering with ?'

" 10. The court erred in using the following language: ' All he can say is whether such a fall would be natural to contribute to the injury in question. I don't suppose

a child would contract scarlet fever by falling through a sidewalk. You may show that stepping through the sidewalk was the probable cause of this injury.'

"11. The court erred in refusing to strike out that portion of witness Shields' testimony wherein he said: 'And straining his leg.'

"12. The court erred in denying defendant's request to direct a verdict for the defendant on the ground that ' the negligence of the parents must be attributed to the child under the facts of this case.'

"13. The court erred in refusing to permit counsel for defendant to argue to the jury the negligence of the parents, so that the jury might pass upon the intent of the parents considering the premises.

"14. The court erred in permitting witness Weber to answer the hypothetical question on page 32 of the record.

"15. The court erred in permitting witness Weber to answer the question in reference to Dr. Shields: ' He is a reputable physician.'

"16. The court erred in charging the jury as follows:

" 'Gentlemen of the jury, there is another feature which is common to cases of this description, which is eliminated from this case. That is the case of contributory negligence. I charge you, gentlemen of the jury, that no negligence on the part of the parents of the boy in taking him over the walk in question can be imputed to the boy, and that, therefore, no negligence of the father would bar his right of action, as it would bar another if he was guilty of such conduct as contributed to the injury. I also charge you that a boy of that age, four years and three months, who is being led by his father, cannot be guilty of contributory negligence.' "

Defendant's counsel admit that several of the above assignments of error would be trivial in an ordinary case, but insist that, since the sole question of fact for the jury was whether the fall of the child was the cause of the abscess, the rulings of the court permitting improper statements of opinions and conclusions of witnesses were materially prejudicial to the defense.

No requests to charge were presented by defendant's counsel, the issue of fact was clearly and fairly stated to the jury, and the charge is not questioned, save as to the instruction that the negligence of the father could not be imputed to the child, in which respect the charge cor-

rectly stated the law. *Shippy* v. *Village of Au Sable*, 85 Mich. 292; *Mullen* v. *City of Owosso*, 100 Mich. 105 (23 L R. A. 693). The fact that in this case the father had hold of the child's hand at the time of his fall does not affect the principle involved.

The child's father testified regarding his injuries as follows:

"As we were going home there, I had the little fellow, holding him by the hand, and he stepped into the hole. He fell with such force as to throw him against me and injure his leg so that he started to cry, something that is unusual for him to do. As we were going home he cried all the rest of the way, and when we got in the house he was crying, and we considered him hurt. I was on the outside going south. The mother was on the inside going the same way. This place is about 270 feet from Berlin street. I didn't see him the next morning. I saw him at noon. I saw his leg at that time. It seemed swollen to me, and red. Well, he was around the house; he was lying down on the couch. The hole he stepped into was, I should judge, about 6 inches. The second day after the accident I saw him. He couldn't use his leg. It was so painful he couldn't use it. I know it was painful by his actions. He had a very high fever, and the doctor said he had a very bad fever.

" *Q.* State what you know yourself about it.

" *A.* There was a swelling there, and he was lying on the couch. It was a hot day, and we brought him down stairs. *He was in awful pain and agony.*

" *Mr. Hally:* I ask that the answer be stricken out. The last part of the answer, where he says he was in awful pain and agony.

" *The Court:* He can't testify to that, but he can testify as to what he did and how he looked.

" *Q.* What was his appearance?

" *A.* Well, he had a very bad appearance.

" *Mr. Hally:* I ask that the answer be stricken out.

" *Mr. Nutten:* I consent that it be stricken out.

" *Mr. Hally:* Do you consent, also, to the other Mr. Nutten?

" *Mr. Nutten:* I consent to that one.

" *Mr, Hally:* Did your honor rule upon that?

" *The Court:* I think he may testify to the other. It seems to me that he can describe indications of pain.

" *Mr. Hally:* It seems to me that it is entirely inadmissible to have his conclusion go into the case.

" *The Court:* That is true, but upon the part of the child, if he was crying or if his features were drawn up, so as to indicate that he was suffering, I think he would naturally form a conclusion that he was in pain.

" *Mr. Hally:* That is for the jury. If he can draw such a picture as that to this jury, we will not object to it.

" *The Court:* It is difficult to describe the distortions of the features, but yet, at the same time, I think we can all tell if a child has something the matter with it or not. We may look over a child and find that the child has pain.

" *Mr. Hally:* Yes, but children cry when there is nothing the matter with them.

" *The Court:* If we look at a pin sticking into a child, we conclude it has a pain. I think you may testify in this case that you examined the child and found the redness that you spoke of.

" *Mr. Hally:* Note an exception.

"*Q.* Mr. Boehm, what was the boy's appearance at that time?

" *A.* His appearance was that he was all in a fever and pain.

" *Q.* Why do you say pain?

"*A.* On account of the swelling there, and he was always holding his hand on there. In general, I took him, as a father would take a child, to be in very bad pain.

" *Mr. Hally:* I ask the answer be stricken out as incompetent.

" *The Court:* I will let it stand, and give you the benefit of an exception.

"*A.* I saw him three days after the accident. There was quite a swelling there then. Quite a swelling and all red. He was confined to his bed. I saw him every day, from day to day, up to the time of the operation. He was growing worse right along. The swelling was getting larger, and he seemed in more pain every day.

" *Q.* State his appearance. Not how he suffered pain, but how he appeared to you. You can't tell whether he suffered pain in his own mind, but what appearance did he have?

"*A.* He looked all drawn up, and was crying as if being in pain. Certainly he would not move. *We could not hardly touch his leg. It was so painful.*

"*Mr. Hally:* We object to that, and ask that his answer be stricken out. It is outside of his knowledge whether the child could do such a thing or not.

"*A.* I touched the child's leg, and he screamed just as soon as I touched him. After he was confined to his bed, he stayed in bed all the time.

"*The Court:* I think you may testify to the child's manner when you touched his leg.

"*Mr. Hally:* That is not what I take an exception to. It was his opinion that the child could not do certain things. He could not get out of bed. He could not touch his leg. He could not move. He could not hardly touch his foot. Those things I object to. It is entirely without the knowledge of the witness.

"*The Court:* Note an exception.

"Before this accident, the boy was never known to be sick a day outside of cutting two large teeth, and was always healthy, robust, and little full, fat, red cheeks. We never knew what a sick day, a restless night, was with him.

"*Q.* What was his condition subsequent to the accident?

"*A.* Well, he has had middling poor health.

"*Mr. Hally:* I think that this is carrying the opinion of the witness too far. I object to the answer, and ask that it be stricken out upon the ground that this witness is, in the first place, not competent to judge of the child's condition, and, in the second place, he is not competent to say that his present condition is the result of any injuries or alleged injuries that he received.

"*The Court:* Answer the question. Note an exception.

"*A.* Well, since he has been up, he has got to be pale, and his leg is not right as it used to be. He is thinner, and looks more haggard than what he did, and he limps on that leg after running around and playing or skating, and he can't walk no distance at all without tiring out; that is, he drags his leg. He can't do anything like that. Before the accident we never noticed him dragging his foot or limping."

The child's mother testified:

"He stepped into this hole, and he commenced to cry, and said it hurt him, and he kept kind of whimpering and crying until he got home, and he was restless during the night, and in the morning he complained of it hurting

him. It was then inflamed and swollen up a little, and it continued to swell, and we put hot plates on until about the fifth or sixth, and the operation was performed. I think it was the next morning when we called the doctor. It was the right leg, a little below the groin. He was confined to his bed about six weeks. Before the accident there was nothing the matter with his leg at all, and he was always a healthy child. We never knew what it was to be up with him, except two times Mr. Boehm spoke of. Since the accident, at night he has been very nervous, and said that his leg pained him. He put his hand there, and said it hurt him, and he cries. The next morning after the accident it was inflamed, swollen up a little, and it continued to swell, and we put hot plates on until about the fifth or sixth, and the operation was performed. It was very painful from day to day. Every time we touched it or moved his leg any way, he would cry and scream with pain. We called a doctor, I think, the next morning. After he got off his bed, at any time he would walk any distance, he would always say that leg hurt him, and put his hand there, and say it hurt him.

"*The Court:* The remark of the child may be stricken out.

"*A.* The appearance of that leg is just the same. You don't notice it at all, but he says it hurts him, and you can see he favors that leg. Before the accident, he had a very large face, and always had red cheeks, but since that he looks pale and delicate. He has no appetite. I saw the boy's leg the morning of the accident. Before he went away I gave him a bath."

Dr. Samuel Shields, sworn for the plaintiff, testified as follows:

" I am a practicing physician, and have been for 14 years, in Detroit. I was called to treat the plaintiff in August, 1901. I think the 15th.

" *Q.* What was the condition of his leg, doctor, up to the time of the operation after you were first called ?

"*A.* Why, the condition of his leg, at least, my attention was drawn to the condition of the leg from the fact that he complained of that condition; complained of pain, and was very tender there. There was a palpitation. It was tender. You could not touch him. The child had considerable fever, a rapid pulse rate, and the

condition increased until there was a marked swelling, a distention of the leg, just below the groin. Five or six days after I saw him the first time, I concluded that pus had formed in this leg, and I also concluded it was necessary to remove that pus before there was extensive destruction. I think five or six days after I saw the child the first time, I removed the pus and tissues that were broken down, by making an incision over the swelling and dissection down until I got to the pus. I washed out the abscess, and packed that with iodoform gauze, and dressed the leg. I found about two ounces of pus, I should judge, in this abscess.

"Q. Was the periosteum affected?

"A. Yes, sir.

"Q. What was the condition of the muscles there after this operation?

"A. There was a contraction of the muscles and tissues in that part of the leg after he had partially recovered from his troubles; that is, in September or October.

"Q. What do you think, doctor, about the permanency of these injuries you have related?

"A. I think some of those injuries are permanent. * * *

"Q. What are the parts of the leg involved, either by the inflammation or your operation?

"A. Well, the swelling there was apparently Poapart's ligament, and in the center anterior portion of the leg, and the incision was made in that place, and the destruction of tissue was in that place, extending down towards the bone. There was contraction of those tissues, and there evidently is contraction of those tissues yet.

"Mr. Hally: I ask that that answer be stricken out, that there is evidently contraction of the tissues yet. It is not in evidence when this physician saw this boy last and examimed him.

"Mr. Nutten: We will connect it. (Exception.)

"Q. Doctor, the evidence shows that the plaintiff in this case, Gordon Boehm, a boy of about four years and three months old, was on August 14, 1901, at about 9:25 p. m. of that day, walking along Concord avenue in this city; that it was a dark night, and he was in company with his father and mother; that he had hold of his father's right hand; that the plaintiff was between his father and mother; that he had hold of his father's right hand, and when they arrived at a point about 270 feet from Berlin street that plaintiff stepped into a hole in the sidewalk about six

inches in depth; that he at once commenced crying, and put his hand on the right leg near the groin, and said it hurt him there; that he cried after he reached the house, which is about 240 feet distant, and again complained of this leg hurting him there; that through that night he was sleepless; that the next morning his right leg near the groin was swollen and inflamed; that he complained of considerable pain in that region; that immediately prior to his stepping into this hole there was nothing the trouble with his right leg, so far as his mother knew; that his health immediately prior to the accident was good. If the testimony in this case is true, doctor, to what would you attribute the condition of his leg when you saw it on the 15th of August?

" *Mr. Hally.* I object to the question, because it contains facts that have not been produced here on this trial. They may be known to the doctor, but they have not certainly appeared in the evidence here.

" *Mr. Nutten:* I would like those facts. State them, and I will eliminate them. What are the elements of which you complain?

" *Mr. Hally:* The evidence in the first place is that he did not begin to cry, simply he whimpered and complained some. There is no evidence that next day there was any swelling at all. There was some redness there. This question says that there was swelling next day. There is no evidence at all in this particular case that this boy put his hand any place. The evidence is that he fell up against his father; that he never left his father's hand; the father never let go of him. There are plenty of facts that are in this case here that are not included in that hypothetical question.

" *The Court:* There is no question but his father testified, when he went in the hole, he had hold of his hand, and he fell up against him. I suppose that that might be compatible with his holding on the hand at that time. Note an exception. Let the question be answered.

" *A.* My opinion is that his injury dates from the time that he stepped into the hole.

" *Dr. Lane:* If he was injured, there is no question but it would date from that time. The only question is whether such a condition would arise from that injury. The question is, Was this the result of the injury—this condition complained of by the boy? We don't concede it was injured at all.

"*Mr. Nutten:* The doctor says he saw him every day from five or six days after the injury.

"*The Court:* It seems to me that two ounces of pus would show an injury of some kind.

"*Mr. Hally:* I take an exception to the remarks of the court.

"*Q.* On the 15th of August, up to the time of the operation, would there be any question in your mind but what the injury you have detailed followed as a natural result from the injury, or from his stepping into the sidewalk?

"*Mr. Hally:* I object to that as not covered by the testimony, and as asking for a conclusion not based upon anything, nor the facts that have been produced here. It asks the doctor for an opinion which can be based either upon facts that the doctor knows that are not evidence, or anything at all that the doctor has a mind to consider as evidence to justify the conclusion.

"*Mr. Nutten:* I will add to my question, then, assuming that the child's leg was all right prior to the time he stepped into the hole on the night of the 14th of August?

"*Mr. Hally:* Same objection, and the same reason following the objection, to the addition to the question.

"*The Court:* In the absence of any other cause for that, would you attribute it to stepping into the sidewalk, or would stepping through a hole in a sidewalk be likely to produce injuries such as you found the child suffering?

"*Mr. Hally:* I object to the doctor giving any testimony based upon a likelihood. I don't think anybody is allowed to testify to what is likely to happen.

"*The Court:* All he can say is whether such a fall would be natural to contribute to the injury in question. I don't suppose a child would contract scarlet fever by falling through a sidewalk. You may show that stepping through the sidewalk was the probable cause of this injury.

"*A.* From my experience, I would say that the injury that I found Gordon Boehm suffering from could be produced by stepping into a hole in a sidewalk and straining his leg.

"*Mr. Hally:* I ask that the answer be stricken out, because it includes in this answer testimony that is not in this case.

"*The Court:* What is it?

"*Mr. Hally:* Straining of the leg.

"*The Court:* Note an exception then.

" I examined the boy to see whether he did limp, about six months after the injury. I saw him walk across the floor. He walked with a limp.

" Q. When did you examine this boy last ?

" A. I examined him somewhere about two weeks ago. "

Dr. Nathaniel W. Weber, a witness sworn for the defendant, testified as follows:

" I have been a physician of medicine and surgery in this city for 35 years. I am a specialist in diseases of women. I made an examination of this little boy for a supposed injury to a limb. I found in a straight line transversely with the thighs scarcely perceptible—I mistook some other condition about the thigh for what I was looking for, not knowing exactly what to find. I found a straight cicatrix or scar transversely across the upper part of the thigh. That I had to look for with considerable care to see. I found some difficulty in finding that scar.

" Q. Was the place pointed out to you where that scar was; that is, the region ?

" A. They put their finger down. I think I discovered it about the same time. I would say that they showed it to me and I discovered it about the same time. I didn't find any abnormal condition. Both thighs were about the same size, no loss of tissue, and the slight scar that I saw indicated possibly suppuration beneath sometime.

" Q. Did you find any other condition of the boy ?

" A. I found an enlarged gland in the groin, in both groins, and in the neck.

" Q. From your examination of the boy, if there was any abscess there at any particular time, what do you think was the cause of that abscess ?

" A. Under such conditions as I found, an abscess is liable to form without any injury at times. Glands suppurate and are destroyed by simply the child's health becoming impaired, and sometimes they break down without any particular cause. "

On cross-examination he testified:

" Q. You say you can't conceive of any such condition would result in a healthy child. Do you mean to tell me, doctor, do you mean to tell this jury, that if the child was perfectly robust and healthy on the night of August 14,

1901, that his health was excellent, if he steps into a hole six inches deep, that he immediately commences to cry, that he cries from that time until he gets into the house, 240 feet away, that he cries after he gets into the house, puts his hand upon his groin and says it hurts him there, that in the morning there was a swelling, and inflammation there and pain, do you mean to say, doctor, that, these facts taken into consideration, the fact that the leg was perfectly well immediately previous to the accident, if it would not be referable to the fact of his stepping into that hole, if this condition would not be referable to the fact of his stepping into that hole the way he did ?

"*A.* Well, putting it that way, of course, you have got to take the symptoms as they occur to you and the previous history and all that.

" *Mr. Hally:* I desire an objection to that, and now ask the answer be stricken out, unless the portion of the testimony is eliminated that the boy put his hand on the groin. There is absolutely nothing to warrant that in this case.

" *The Court:* I have forgotten about that.   I will give you an exception.

" *Q.* Do you know Dr. Shields ?

"*A.* Yes.

" *Q.* He is a reputable physician ?

" *Mr. Hally:* I object to that.   Nobody has questioned that.

"*A.* He is a graduate.   He has my name to his diploma.

"*Q.* He is a reputable physician here ?

"*A.* Yes.

" *Mr. Hally:* I object to that.   He can't bolster up a man that is put upon the stand, when the truth of it has not been questioned.   I ask it be stricken out.

" *The Court:* I don't think there is any particular harm done.   You don't question his reputation.

" *Dr. Lane:* His testimony stands for what it is worth upon the witness stand."

The testimony above quoted comprises all of the testimony in the record concerning the child's suffering as a result of the injury and the connection between the fall and the abscess.   It is manifest that, if the jury gave any credence to the undisputed testimony of the parents and the attending physician, they must have found that the plaintiff suffered great pain, independent of the expression of

opinions or conclusions to that effect.   The exclamations, acts, and demeanor of the child, which were undoubtedly competent, fully establish the fact that he suffered great pain, and the admission of the opinions complained of, if error, was, under the circumstances, not sufficiently prejudicial to call for a reversal of the case.

The sixth assignment of error was disposed of by the testimony, put in after the objection was made, that the doctor had examined the child two weeks prior to the trial.

The seventh and fourteenth assignments of error are not well founded.   The point of the objections made to the trial judge was not, as in the brief in this court, that there was no evidence in the case that the child "at once" put his hand on his groin, but that "there is no evidence at all in this particular case that this boy put his hand any place."   There was abundant evidence that the boy frequently put his hand upon his groin; in fact, his father said, "he was always holding his hand on there."   Furthermore, the answer of Dr. Shields shows that he did not base it upon the hypothetical question at all, but upon his examination of the child.

"From my experience, I would say that the injury that I found Gordon Boehm suffering from could be produced by stepping into a hole in a sidewalk and straining his leg."

We think, also, that the question was substantially based upon the testimony and was properly allowed.

The answer of Dr. Shields above referred to also disposes of the ninth and tenth assignments of error. Whether the question permitted by the court was proper or not, what was actually testified to by the doctor was admissible.   *Bush* v. *Railway Co.*, 113 Mich. 513.   There was evidence in the case from which the jury could properly find that the child was a healthy, robust child, with perfectly sound legs, immediately prior to his injury, and that an abscess formed after the injury, which might have been caused by straining his leg.   But, if there

was no evidence of the straining of the leg, this did not render the doctor's testimony incompetent. It was proper to show how the abscess might have been caused. Whether the proofs at the close of the testimony justified the submission of the case upon that theory would present another question.

We find no errors in the record justifying a reversal of the judgment, and the judgment is affirmed.

McALVAY, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.