Robert MARINO, an infant under the age of fourteen years, by his guardian ad litem Joseph Marino, Joseph Marino, Richard Catricala, an infant over the age of fourteen years, by his guardian ad litem Frances Catricala, and Frances Catricala, Plaintiffs,

v.

Harold J. KANE, Defendant.

Robert MARINO, an infant under the age of fourteen years, by his guardian ad litem Joseph Marino, Joseph Marino, Richard Catricala, an infant over the age of fourteen years, by his guardian ad litem Frances Catricala, and Frances Catricala, Plaintiffs,

v.

UNITED STATES of America, Defendant.

United States District Court
S. D. New York.
June 6, 1955.

Diamond & Kreitman, New York City, Robert Klonsky and Jack Steinman, New York City, of counsel, for plaintiffs.

J. Edward Lumbard, U. S. Atty., New York City, Morton S. Robson, New York City, and Miriam Goldman, New York City, of counsel, for defendants.

IRVING R. KAUFMAN, District Judge.

In these consolidated actions Robert Marino and Richard Catricala, by their guardians ad litem, seek damages for injuries sustained by them when they were struck by a Post Office vehicle owned by the defendant, United States of America, and operated on its behalf by the defendant Harold Kane. In addition, a parent of each child sues to recover for loss of services and expenses resulting from the injuries to the children.

On July 18, 1950, at about 3:30 P. M., Robert, then approximately five years of age, and Richard, then fifteen years of age, together with Joseph and Alice Marino, the parents of Robert and the aunt and uncle of Richard, alighted from a bus on the east side of Edward L. Grant Highway near its intersection with 170th Street, in the Borough of Bronx, City and State of New York, and commenced to cross the highway from east to west. At the time they commenced crossing the north bound lane of Grant Highway, the traffic signals were red for traffic on the Highway. They safely reached the elevated safety island which divided the north and south bound lanes of the Highway, at a point some distance south of its intersection with 170th Street. Joseph Marino, carrying Robert's baby brother in his arms, proceeded from the safety island to cross the south bound lane of the highway to the west curb. At about this time, there were two vehicles proceeding south on the highway. One was the government truck, operated by the defendant Harold Kane, which was traveling in the lane immediately adjacent to the safety island. The other was a privately owned automobile which was proceeding in front of the government truck and in a lane to the right of the lane in which the government truck was traveling.

It had stopped raining a short time before the accident and the road was wet. The private car suddenly applied its brakes and was forced into a skid, as a result of which it made approximately one turn, and in so doing moved towards the lane in which the Post Office vehicle was traveling. The driver of the government truck, observing this, applied his brakes and swerved so that the front of his truck veered to the right and the rear to the left. As a result, the rear of the truck overlapped the island and struck

the two infants who were standing upon the safety island.

I shall first deal with the controversy over the cause of the sudden application of the brakes by the private automobile. Joseph Marino testified that while he was crossing the south bound lane of the highway from the safety island to the west curb he observed both the Post Office truck and the private automobile at a standstill at the intersection. He testified that when he reached the west curb he observed both vehicles for a sufficient time to be able to approximate the speed of the truck and to estimate the distances between both vehicles before the private car braked. He testified that he saw the brakes applied by the private automobile and the skidding and also saw the truck mount the safety island but did not see or know what caused the automobile to brake. So far as he observed, he testified, the automobile applied its brakes for no apparent reason. He saw no persons, cars or obstacles in the private automobile's path. Similarly, Richard Catricala was unable to give a reason for the application of the brakes.

On the other hand, Kurt Reich, the driver of the private automobile, testified to the more probable and credible version. He stated in contradiction of Joseph Marino that he did not stop for a light at the intersection[1] and that he had to apply his brakes because Joseph Marino[2] suddenly crossed into the path of his automobile. It is to be recalled that Joseph Marino testified that he sufficiently observed the situation to be able to approximate speeds and distances and to state that no obstacles were in the private automobile's path, but that the automobile applied its brakes for no reason apparent to him. This taxes credulity. The brakes were applied with such force as to turn the car approximately 180 degrees. It is not likely that Reich would

be forced to do this without some obstacle suddenly looming before him. I am impelled to the inescapable conclusion that Reich was forced to take this action by the conduct of Joseph Marino who crossed into his path.

Joseph Marino's testimony as to his location in the south bound lane when the light changed wavered from one-fourth to three-fourths of the way past the safety island towards the west curb. Even if we are to assume that the light had just changed green for pedestrians when Joseph Marino *began* crossing from the bus stop to the safety island—a fairly long distance—it is most probable that the light was in process of changing when Mr. Marino first reached the safety island. This reasonably explains the reason for his wife waiting behind on the island with the two children and not attempting to cross from the safety island to the west curb, as did Marino. I believe Marino decided to "chance it" across. Under all the circumstances—and being mindful of the wet pavement—his conduct was clearly negligent. His negligence definitely contributed to the accident. I, therefore dispose of Joseph Marino's claim at the outset and find that he, in his individual capacity, is barred from recovering damages for any loss of services or expenses sustained by him as a result of the injuries to his son Robert.

We now approach the question of the defendants' negligence. Defendant Harold Kane, the driver of the government truck, testified that he was proceeding at approximately 25 miles per hour at the time of the accident—the maximum speed limit—and admitted that he could have been going in excess of 25 miles per hour since the speedometer in his truck was not working. I believe it more probable that he was exceeding 25 miles per hour. He testified that he kept the

---

1. Harold Kane, with less certainty than Kurt Reich, similarly testified that he did not stop for a light at the intersection.

2. The witness' identification of Joseph Marino as the man in his path was persuasive. He stated that he observed that the man was carrying a baby in his arms. Joseph Marino testified that no other persons were in the immediate vicinity of the automobile at the time it braked, and that he was carrying a baby in his arms.

same distance between his truck and the private automobile for about four blocks before reaching the intersection; that the automobile was probably going over 25 miles per hour, and that he did not stop for a light at the intersection.[3]

█ Reich, it is recalled, testified that immediately before the accident the truck was about to overtake him. The truck was in the far left or passing lane of the highway. Under the conditions prevailing at the time and place of the accident—a wet, cobblestone road, on a down grade—I find that the speed which Kane maintained immediately before the accident and his conduct in attempting to overtake the private car constituted negligence. Even if the version of the government that the defendants were proceeding at the 25 mile speed limit were accepted, I believe that under the adverse road conditions which prevailed at the time of the accident, maintaining such a speed would constitute negligence. In the instant case, however, I find that Kane exceeded the speed limit prior to the application of his brakes. I also find that the negligence of the defendants was a proximate cause of the accident. I believe that had Kane maintained a reasonable speed in the light of the road conditions, it is probable that he would have been able to control his truck and have avoided the accident. Furthermore, it is recalled that there was at least a space equivalent to the dimensions of one car between the right of Kane's truck and the left of Reich's automobile when Reich's car came to a stop. Hence, one questions the reasonableness of Kane's conduct in operating the truck as he did in attempting to avoid contact with Reich's car.

█ I find, therefore, that damages are recoverable on behalf of both infants. No question of contributory negligence on the part of either of the infants has been presented in this case. Of course, the contributory negligence of Joseph Marino cannot be imputed to Robert Marino, so as to bar Joseph Marino's action as guardian ad litem on behalf of Robert Marino. N.Y. Domestic Relations Law, McKinney's Consol.Laws, c. 14, § 73.

We shall now turn to the damages recoverable on behalf of Robert Marino. It is contended that Robert sustained permanent organic brain damage as a result of the accident. The existence of such brain damage is the most sharply contested issue in the case. Joseph Marino testified that Robert was propelled a distance of about 25 feet and was rendered unconscious for about five minutes. He also testified that prior to the accident his son Robert had been a normal child and that after the accident he became a behavior problem. Specifically, Joseph Marino testified that his son now stutters, has facial grimaces, moans in his sleep, and is a behavior problem in school to the extent that the school authorities referred Robert for psychiatric guidance. Mrs. Marino substantially reiterated the testimony of her husband. It is contended that this testimony indicating that Robert was psychologically normal before the accident and psychologically abnormal after the accident coupled with the medical testimony to be discussed later clearly proves that the extent of psychological abnormality now manifest in Robert resulted from permanent organic brain damage proximately caused by the accident, or from some head[4] injury less serious than permanent organic brain damage.

On the other hand, defendants contend that Robert sustained no permanent organic brain damage or head injury and that whatever neurotic behavior he presently exhibits preexisted the accident and was caused by the adverse environmental conditions to which he was exposed throughout his formative years. The defendants mainly rely to support their contention upon Joseph Marino's testimony as to the conditions existing in the

---

3. Reich, the driver of the private automobile, also testified to this.

4. There has been medical testimony that a blow to parts of the body other than the head can nevertheless cause head injury.

home. Joseph Marino testified substantially as follows: From 1944 until 1952, he, his wife and Robert, born in 1945, lived in the same home with his mother, divorced sister and her two children. Relations between Mrs. Marino and her mother-in-law were extremely strained. They had frequent fights and the police were called on occasion. These quarrels mainly centered upon the proper upbringing of Robert. Mrs. Marino also had strained relations with her sister-in-law. Furthermore, on at least one occasion Mr. Marino contemplated leaving his wife. Robert personally observed many of these intra-family quarrels. The family lived under conditions of poverty; Joseph Marino being unemployed and on relief for extended periods of time. Mrs. Marino gave birth to Robert at the age of seventeen. She had some difficulties with the law at the age of thirteen. She suffers from a seizure pattern and has had many fits and seizures some of which her son Robert observed. It is noted that Robert testified that his mother became as hard as stone during these attacks and that this scared him.

From other evidence in the case, it is evident that both Mr. and Mrs. Marino were and are mentally inadequate. Mrs. Marino has an I.Q. of 75; Mr. Marino has an I.Q. of 50. Based upon this testimony indicating that Robert as an impressionable youth in his formative years has been reared in his grandmother's home by mentally inadequate parents, one parent suffering from a seizure or convulsive disorder, in an environment of poverty and strained family relations where constant strife was witnessed by the youth, and upon the medical testimony of the defendants, to be discussed later, the defendants urge that Robert's behavior problems resulted from his background rather than from any brain damage or head injury sustained by him in the accident.

The plaintiffs called Drs. Horowitz, Stanton and Madonick as expert witnesses. Dr. Horowitz testified that he examined Robert on December 12, 1950 and again as recently as May 1955. He testified that at the time he first examined Robert he observed that Robert was a hyperactive child who occasionally manifested facial grimaces, twitches, hesitancy in speech and awkwardness in walking. He testified that aside from the speech hesitancy his recent examination of Robert indicated that the previously observable symptoms had disappeared. His conclusion was that Robert sustained permanent brain damage as a direct result of the accident and that his behavior pattern was not the result of his home environment but was due to the brain damage. He testified that his conclusion as to permanent brain damage was based primarily upon the fact, testified to by Mr. and Mrs. Marino, that Robert was rendered unconscious for approximately five minutes as a result of the accident and secondarily upon the electro-encephalograph (hereafter E.E. G.) examination of Robert. The E.E.G. is a mechanical charting of the rhythm and intensity of electrical impulses emanating from the brain. By observing the pattern of recorded electrical impulses certain inferences as to the probable condition of the brain may be drawn. All of the doctors who testified stated that an E.E.G. is merely a tool with respect to brain conditions but cannot be utilized *per se* for definitive diagnosis.

Dr. Stanton, a psychiatrist, examined Robert on November 2, 1954. He testified that the only objective manifestation which he observed was that Robert appeared irritable. The doctor testified that he based his conclusion that Robert is currently suffering from a permanent neurosis competently produced by brain injuries which resulted from the accident largely upon the following history related to him by Mrs. Marino: Robert was rendered unconscious as a result of the accident and subsequent to the accident he began to moan in his sleep, developed headaches, and became over-active, aggressive and destructive. In addition, the doctor testified that he based his conclusion upon the E.E.G. report and a report of an examination conducted by a

clinical psychologist of the government. In concluding that Robert's present behavior pattern was caused by the accident and not by his home environment, the doctor laid great stress upon the history of headaches which was related to him by Mrs. Marino.

Dr. Madonick, a neurologist and psychiatrist, examined Robert on December 27, 1950. He testified that he observed that Robert was somewhat hesitant in his speech and was restless. Upon a history substantially similar to that related by Mrs. Marino to Dr. Stanton, Dr. Madonick concluded that Robert sustained permanent brain damage as a result of the accident.[5]

The government called Drs. Zinkin and Klingon. Dr. Zinkin, a psychiatrist and neurologist, examined Robert on November 26, 1954. He testified that the neurological examination which he conducted was negative and that the E.E.G. did not indicate any organic brain damage or head injury that had been caused by the accident. He stated that the pattern of the E.E.G. indicated a diffuse disorder and that a trauma or blow usually causes a focal disorder. Moreover, he testified that the E.E.G. did not indicate any brain lesion or tumor. He concluded that Robert's E.E.G. was more consistent with a seizure disorder and that this was the more probable interpretation in view of his home environment and the past history of seizures in Robert's mother.

Dr. Klingon, who directed that an E.E.G. be performed on Robert, testified that he could not state that the E.E.G. indicated organic brain damage. He stated that the diffuse E.E.G. pattern was strongly connected with Mrs. Marino's history of fits and seizures and that it is more probable that Robert has a seizure disorder resulting from non-traumatic sources. Moreover, he was of the opinion that even if the accident caused Robert's present behavior pattern that the behavior pattern was a temporary psychological, non-organic reaction to the trauma.

Although the doctors have differed significantly in their conclusions as to the competent producing cause of Robert's present behavior pattern, certain factors make their testimony, taken as a whole, quite consistent and clear. In the first place, a sharp separation must be drawn between psychological symptoms which result from actual organic brain damage and those which result from other causes. With respect to actual organic brain damage, the most significant factor upon which plaintiffs' doctors rely, is the E.E.G. All the doctors have stated that unconsciousness merely fortifies a conclusion of organic brain damage since many persons who are rendered unconscious do not sustain brain damage. Dr. Madonick, the neurologist and psychiatrist, called by the plaintiffs, stated that if the E.E.G. results were excluded from consideration he would be unable to conclude that Robert sustained permanent organic brain damage or that the accident rather than his home environment caused his present behavior difficulties. I believe that this testimony coupled with that of Drs. Zinkin and Klingon that the E.E.G. pattern indicated a diffuse—seizure disorder symptomatology rather than a focal—traumatically caused behavior disorder was highly persuasive of the non-existence of actual organic brain damage caused by the accident. Dr. Madonick was rather vague when cross-examined on the causal relationship between the accident and the E.E.G. pattern indicating a diffuse brain disorder. I find, therefore, that it has not been proven by a fair preponderance of the evidence that Robert Marino sustained any organic brain damage as a proximate result of

---

5. It is interesting that Dr. Madonick further testified that the relationship between pulse rate and temperature is significant in determining whether a person has sustained organic brain damage. He stated that this relationship when applied to Robert's temperature and pulse rate shortly after the accident as indicated in the hospital record did negative the existence of organic brain damage.

the accident. However, this does not mean that any observable psychological symptoms which Robert presently manifests and which are not due to organic brain damage but which nevertheless can be causally connected to the accident cannot be the basis of some recovery. With respect to these symptoms, I find that the speech impediment is the only disability which has been proven by a fair preponderance of the evidence to have been non-existent prior to the accident. Therefore, I cannot find that symptoms other than the speech disorder are causally connected with the accident. On this point, the medical testimony offered by both sides is quite consistent. All of the doctors agreed that a conclusion that a given condition presently manifest was caused by a trauma depends almost completely upon a pre-accident history indicating the absence of such a condition.

In other words, a sound medical conclusion of traumatic causation can be based only upon the non-manifestation of the condition prior to the accident and the manifestation of the condition a reasonable time after the accident. I find that apart from Robert's speech defect, it has not been proven by a fair preponderance of the evidence that the behavior pattern manifest in Robert subsequent to the accident did not pre-exist it.

On this score, the defendants introduced into evidence a record of the Board of Health Clinic to which Mrs. Marino took Robert prior to the accident for routine medical checkups. (Exhibit D.) On June 28, 1948 (almost two years prior to the accident) there is an entry in the record to the effect that Robert was a very active child (the doctors called by the plaintiffs attached some significance to the "hyperactivity" of Robert after the accident) and was uncooperative during the examination. There is a further entry dated December 27, 1948, which indicates that Mrs. Marino stated that Robert had enuresis and was a very active child. On October 14, 1949, according to the Clinic's record, Mrs. Marino stated that Robert was an irritable and nervous child who bit his nails, was extremely active and disobedient. She also stated that he fought with "all the children". On May 4, 1950, after Robert's tonsils and adenoids had been removed, there is a notation "no problems" and another to the effect that Robert "plays nicely with children". I do not believe that the last notation nullifies the effect of the fairly consistent prior notations. It is recalled that Mrs. Marino testified that Robert bit his nails and was an enuretic prior to the accident.

In any event, there is other significant evidence which indicates that it is as probable as not that Robert had the same or a very similar behavior pattern before the accident as after it. It is probable that Robert's adverse home environment during the psychologically crucial formative years of his life caused the very same symptomatology found present subsequent to the accident to manifest itself prior to the accident. It is noted that Mrs. Marino testified that Robert bit his nails and was an enuretic prior to the accident. The other and more vague symptoms of supposed psychological abnormality observed by the doctors or related to them by Mrs. Marino—restlessness or "hyperactivity", irritability and aggressiveness—are consistent with conditions which existed in Robert's home prior to the accident and may well have manifested themselves prior to the trauma and indeed did, as corroborated by the entry of October 14, 1949, in the Clinic's record. The thrust of this is that it has not been established to my satisfaction by a fair preponderance of the evidence that these general symptoms did not pre-exist the accident and I am inclined to the view that they did. The probabilities indicating their pre-existence based upon Robert's psychologically adverse home environment and the existence of many of these symptoms in 1949 (according to the Health Clinic Record) have not been overcome by the other evidence. Moreover, the extent to which these nebulous manifestations differed, if at all, in their intensity prior and sub-

sequent to the accident · has not been specifically pin-pointed.[6]

Dr. Stanton, called by the plaintiffs, laid great stress upon the headaches which Robert is alleged to have developed after the accident, in reaching his conclusion that Robert's present behavior difficulties were not caused by his home environment but by the accident. It should be noted that none of the other doctors even alluded to the headaches when they testified as to the symptoms which they considered significant in reaching their medical conclusions. Moreover, Dr. Stanton testified that the history as to headaches was furnished to him *post litem motam* by Mrs. Marino. Robert, who was called to the stand without being sworn, testified that he was feeling well. On the whole, I find that Dr. Stanton's opinions based strongly upon these headaches are not particularly persuasive.

Alternatively, any medical testimony that would support a finding that the accident aggravated the pre-existing psychological symptoms is unavailing in the face of the failure to establish with a reasonable degree of specificity Robert's psychological condition, qualitatively and quantitatively, prior to the accident.

Even apart from the lack of credible evidence as to the non-existence or relative absence of psychogical involvement prior to the accident, the proof as to the extent of Robert's present disabilities is not particularly persuasive. Dr. Horowitz, called by the plaintiffs, performed the most recent examination of Robert. He testified that apart from Robert's speech impediment he observed no nervousness, hyperactivity, grimaces or awkward walking. At best, Robert's present symptomatology—being a · "behavior problem" in school—is as tenuous and nebulous as the favorable conditions in his home environment have been.

On the other hand, I am convinced that Robert's present speech impediment which was observed by Drs. Horowitz, Madonick, Zinkin and by the Court did not exist prior to the accident. Both Mr. and Mrs. Marino positively testified to this fact. There is no evidence which impeaches their testimony. All of the doctors testified that an injury to the head including one that does not cause actual organic brain damage can be the cause for the original precipitation of a pre-existing and latent psychological or neurotic tendency. Dr. Zinkin, the neuro-psychiatrist, called by the defendants, stated that such precipitation was not only possible but probable. Therefore, whether Robert had a latent tendency towards speech hesitancy (characterized by some of the doctors as "stuttering" or "slurring") which was originally created by his adverse home environment and precipitated or made manifest by the accident or whether it wholly originated with the accident without any prior tendency, is immaterial. Therefore, I find that it has been established by a fair preponderance of the evidence that Robert Marino's speech impediment was proximately caused by the accident, but that it has not been established by a fair preponderance of the evidence that any other psychological or neurological conditions were proximately caused by the accident.

With respect to the other physical injuries sustained by Robert as a direct result of the accident there is little dispute. I find that Robert sustained a laceration of his right cheek and lip which resulted in a permanent fork-shaped scar; that he sustained other minor contusions and abrasions and that a few of his teeth were loosened. I also find that Robert was rendered unconscious for about five minutes as a result of the accident, and that he was subjected to a substantial degree of pain and suf-

---

6. For the purpose of eliciting testimony on the crucial issue as to Robert's condition prior to the accident, the plaintiffs called only one witness—Mr. Marino—whose testimony relevant to this was vague and elusive. It should be noted that Mrs. Marino, the most important witness for this purpose, was not called by the plaintiffs. The defendants, with reluctance, called her.

fering. He was hospitalized for five days.

Except for the contention that Richard Catricala sustained a basal skull fracture, the extent of his injuries was not sharply disputed by the defendants. I find that he sustained a fracture of his right wrist which is now completely healed, a mild cerebral concussion including a short period of unconsciousness, and various puncture wounds, lacerations, contusions and abrasions of his left thigh, right shoulder and leg. I find that he also sustained an avulsion of the left thumb, which is now healed. He was hospitalized for twenty-three days, with expenses amounting to $390.27.

■ With respect to the contention that Richard Catricala also sustained a basal skull fracture, I find that its existence has not been established by a fair preponderance of the evidence. Although there is a notation in the hospital record (Plaintiffs' Exhibit 4) on the seventh day after his admission that a basal skull fracture was suspected because Richard had an ecchymosis of his right eye (a "black eye"), this suspicion was never neurologically confirmed. An x-ray of his skull was negative. It is important to note that the final diagnosis more than two weeks later did not include a finding of a basal skull fracture. Dr. Madonick, the director of neurology and psychiatry at the hospital to which Richard was admitted, testified that if a basal skull fracture had existed this fact would have been noted in the final diagnosis if the doctors were not careless. It is highly probable that between the date of the first entry as to ecchymosis and his final discharge, the possibility of a basal skull fracture was ruled out by the hospital's medical staff. In addition, there is an-

other fact which clearly negatives the existence of a basal skull fracture. Dr. Horowitz testified that the probable basis for the original notation that such a fracture was suspected was the appearance of an ecchymosis several days, rather than shortly after the accident. On the other hand, it is noted that Richard admitted to Dr. Madonick at the time of his examination that he sustained the ecchymosis about two hours after the accident. Therefore, I find that it has not been established by a fair preponderance of the evidence that Richard Catricala sustained a basal skull fracture as a result of the accident. Additionally, I find that it has not been proven by a fair preponderance of the evidence that Richard sustained a permanent post-concussion syndrome consisting of headaches, dizziness and fatigue as a proximate result of the accident. However, I do find that Richard was subjected to a substantial degree of pain and suffering for at least the twenty-three days of his hospitalization with temporary residual headaches and dizziness lasting for a short period after his hospitalization.

■ Mindful of all relevant criteria for awarding damages, I find that Robert Marino, by his guardian ad litem, Joseph Marino, is entitled to $18,000; that Richard Catricala, by his guardian ad litem, Frances Catricala, is entitled to $8,000; that Frances Catricala individually is entitled to recover $750 for the loss of services and expenses sustained by her as a result of the injuries to Richard Catricala. I find in favor of the defendants as against Joseph Marino individually. The foregoing Opinion shall constitute my findings of fact and conclusions of law.