[L.A. No. 29728. In Bank. Dec. 29, 1970.]

ETHEL HAFT et al., Plaintiffs and Appellants, v.
LONE PALM HOTEL et al., Defendants and Respondents.

COUNSEL

Louis W. Lawson and Sam Dana for Plaintiffs and Appellants.

Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Thomas T. Anderson, Joseph W. Cotchett and Leonard Sacks as Amici Curiae on behalf of Plaintiffs and Appellants.

Dryden, Harrington & Swartz, Vernon G. Foster, Ellis J. Horvitz and Phyllis M. Hix for Defendants and Respondents.

---

OPINION

TOBRINER, J.—Plaintiffs Mrs. Ethel Haft and her daughter Roberta Haft appeal from a defense judgment, entered upon a jury verdict, in this wrongful death action, brought in connection with the drowning deaths of Mr. Morris M. Haft and Mark Haft, father and son, in defendants'[1] motel pool. Plaintiffs raise numerous contentions challenging the trial court's (1) refusal to take several matters from the jury, (2) refusal to give a requested instruction, and (3) exclusion of various evidentiary matters. As we explain below, we have concluded that under the facts presented at trial, plaintiffs, in demonstrating defendants' failure to provide a lifeguard at the pool as required by statute, sustained their initial burden of proof and that defendants then bore the burden of showing that this statutory violation was not a cause of the deaths. Although defendants failed to meet this burden at the initial trial, we have determined that inasmuch as the parties' respective burdens were not clearly defined at that time, the judgment should be reversed and the cause be remanded for a new trial.

### 1. *The Facts.*

On June 26, 1961 Mr. and Mrs. Haft, and their five-year-old son Mark, traveled to Palm Springs and stayed at the Lone Palm Hotel, operated by defendants. The Lone Palm Hotel is a 90-unit motel, with rooms on both sides of a six-lane through street, Indian Avenue. The motel office, a restaurant and a swimming pool are located on the east side of Indian Avenue; on the west side there are rooms, a swimming pool and a wading pool. The

---

[1] Plaintiffs joined Commodity Credit, Inc., a part owner of the motel, and Mrs. Alice Blackburn, manager and part owner of the motel, as defendants, along with the "Lone Palm Hotel." For convenience, all three parties will hereafter be referred to simply as "defendants."

Hafts were given a room on the west side and it was in the west pool that father and son drowned.

In the morning of the day following the Hafts' arrival, the weather was typically hot for June in Palm Springs, with the temperature around 115 degrees. Mrs. Haft left to go shopping early that morning as Mr. Haft and Mark prepared to take advantage of the motel's inviting pool facilities. At trial, Mrs. Haft testified that although she could not say that her husband and son were "real swimmers" they both could dog-paddle and tread water well enough to get around the pool; this evaluation of the decedents' swimming abilities was confirmed by Mrs. Haft's sister and brother-in-law, who had spent numerous vacations with the Hafts on prior occasions and thus were familiar with the decedents' swimming skills. Mr. Ollson, a guest at the Lone Palm on the day of the drownings, testified for the defense, however, that after hearing of the tragedy Mrs. Haft had exclaimed: "My husband, my son, I told them not to swim—" and that Mrs. Haft had also admitted that "they couldn't swim," "they couldn't put their faces under water."

No one witnessed the actual drownings of the two Hafts. Ollson testified that on the morning of the tragedy, he first noticed the two in the wading pool and later observed them in the regular pool; he testified that he saw no other persons in the vicinity of the pools that entire morning. (The summer is off-season in Palm Springs and the motel was apparently not at all crowded.) When the Hafts were in the main pool, Ollson testified that Mr. Haft was lying on two rubber floating rafts, with Mark astride his stomach; the two were laughing and playing. At the time Ollson first observed the Hafts in the main pool, as he walked by the pool on his way to his motel room, father and son were in the shallow end; when Ollson later viewed the two from his motel room they appeared to be near the deeper end of the pool. This was apparently the last time Mr. Haft and Mark were observed alive.

More than a half hour thereafter Ollson left his room and returned to the pool area, where he observed two bodies submerged in the deep end of the pool. At first Ollson entered the pool but, being unable to swim, found he could not reach the bodies; he then ran to his room to telephone for help. Ultimately an ambulance attendant went into the pool and retrieved the bodies.

Although no direct evidence revealed the manner in which the drownings occurred, the evidence did establish, without conflict, that while defendants had furnished the lounging space, wading pool and swimming pool essential for their guests' recreation, the motel had failed to provide *any of the major*

*safety measures required by law* for pools available for the use of the public.[2]
 Thus the record shows that, with defendants' knowledge, no lifeguard
was present at the pool and no sign advising guests of this fact was posted.[3]
(See Health & Saf. Code, § 24101.4.) No markings on the edge of the pool
stated the various depths of the water or indicated the break in the slope
between the deep and shallow portions of the pool (see Cal. Admin. Code,
tit. 17, § 7788). No sign warned that children were not to use the pool with-
out an adult in attendance (see Cal. Admin. Code, tit. 17, § 7829). No tele-
phone numbers of the nearest ambulance, hospital, fire or police rescue serv-
ices, physician and pool operator were posted in the pool area (see *id.*). No
diagrammatic illustrations of artificial respiration procedures were posted,
nor were there any instructions provided to indicate that, in emergencies,
manual or mouth-to-mouth resuscitation should be begun and continued
until the arrival of a physician or mechanical resuscitator (see *id.*). No 12-
foot-long life poles were available (see *id.*).[4] In short, when measured against
state safety standards, it would be difficult to find a pool that was more dan-
gerous than the attractive facility which the Lone Palm offered its guests,
and in which Mr. Haft and Mark drowned.[5]

In failing to satisfy all of these mandatory safety requirements, which
were clearly designed to protect the class of persons of which the victims
were members, defendants of course were unquestionably negligent as a
matter of law. (*Porter* v. *Montgomery Ward & Co., Inc.* (1957) 48 Cal.2d
846, 849 [313 P.2d 854]; *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d
409, 416 [218 P.2d 17]; Prosser, Torts (3d ed. 1964) p. 202.) Plaintiffs re-

---

[2]Sections 24100 and 24102 of the Health and Safety Code provide that the regula-
tions promulgated under the sections are applicable to all *"public* swimming pools."
(Italics added.) California Administrative Code,, title 17, section 7775 explains the
coverage of the regulations more fully: "These regulations shall apply to all pools, as
defined herein, except private pools maintained by an individual for the use of his
family and friends. The regulations shall apply to, but are not limited to, all commer-
cial pools, . . . *pools at hotels, motels, resorts* . . . apartment houses, clubs, public
or private schools and gymnasiums and health establishments." (Italics added.) De-
fendants do not contend that the regulations are not applicable to the pool in which
father and son drowned.

[3]California Administrative Code, title 17, section 7829 elaborates on this require-
ment as follows: "Where no lifeguard service is provided, the warning sign shall be
placed in plain view and shall state 'Warning—No Lifeguard on Duty' with clearly
legible letters, at least 4 inches high."

[4]Some scanty (and contradicted) testimony indicated that at some point during the
rescue operation a life ring (also required by Cal. Admin. Code, tit. 17, § 7829) was
thrown into the pool. There was no evidence, however, that this life ring was kept at
the motel's west pool and there was some evidence to the contrary.

[5]The evidence also established that defendants had been notified of the state's pool
safety regulations on three different occasions from 1959 to 1961, when a county
department of health inspector examined the motel's two pools and specified the absent
safety devices.

quested the trial judge to direct the verdict for plaintiffs on the issue of liability or, alternatively, to instruct the jury that defendants were negligent as a matter of law and that the negligence was a proximate cause of the deaths.[6] Plaintiffs also asked for an instruction that, under the evidence presented at trial, Mark was not contributorily negligent as a matter of law.

Defendants contended, in response, that the facts did not establish the requisite causation as a matter of law, and also maintained that, under the evidence, the jury should be permitted to find that the wrongful death action as to either or both decedents was barred by contributory negligence. The trial judge, apparently agreeing with the defendants, declined to take either the issue of negligence and proximate causation or the issue of the minor's contributory negligence from the jury. The jury returned a verdict for all defendants on both causes of action.

Plaintiffs raise several contentions on this appeal. Initially, they assert that the trial judge erred in declining to find that defendant's most serious statutory violation—the failure to provide lifeguard services or to erect a sign so notifying their guests—constituted a proximate cause of the deaths as a matter of law. Second, plaintiffs strongly urge that absolutely no evidence supports a finding that Mark Haft, a five-year-seven-month-old child in the care of his father, was contributorily negligent, and that the court thus committed error in permitting the jury so to find. Third, plaintiffs challenge the trial court's exclusion of certain inspection reports which they argue were clearly relevant to the issue of defendants' alleged "wilful and wanton misconduct."[7]

---

[6]Considerable uncertainty arises over whether plaintiffs' second request was merely for an instruction on negligence as a matter of law, or whether plaintiffs were also asking that the "proximate cause" issue be taken from the jury. The trial transcript reveals the following dialogue (Plaintiffs' counsel): "Our second motion is [that] the jury should be instructed that the defendant was negligent as a matter of law. There is no evidence of an exculpatory nature indicating—" The Court: "Counsel, you know the Court is going to give instructions to the effect that if they find these sections were violated, such violations of the regulatory rules and statutory rules is negligence, is that what you have reference to?" Counsel: "No, sir." The Court: "Go ahead." Counsel: *"I'm also asking the Court to make a legal deduction regarding approximate [sic] causation."* The Court: "Well, I don't think the Court can take away from the jury in this case the problem of approximate [sic] cause." Counsel: "That is what my basis is now." The Court: "I understand." Counsel: "I indicated there is no basis upon which any reasonable person can differ that if the regulation were complied [with,] without repeating what I said on the matter of the motion of liability, that if these regulations were complied with, then the only reasonable deduction therefrom would be that they were negligent." The Court: "Your position is crystal clear to the Court. I deny the motion and would not take away from the jury the factual problems I think exist." (Italics added.) Although significant ambiguities obtrude, we believe that the most reasonable interpretation of this passage is that plaintiffs sought an instruction on proximate causation as well as on negligence.

[7]Plaintiffs also claim that the trial court erred in refusing to instruct the jury on the

We proceed to discuss each of these contentions in turn.

2. *Under the facts in the instant case plaintiffs, in proving defendants' violation of the statutory lifeguard requirement, sustained their initial burden of proof on the issue of causation; the burden then shifted to defendants to show that their violation was not a proximate cause of the deaths.*

■ Although the proof of the numerous statutory and regulatory safety violations established defendants' negligence as a matter of law, this proof of negligence alone, of course, did not automatically establish liability; plaintiffs still bore the initial burden of showing that defendants' negligence was a proximate cause of the deaths. (E.g., *Gonzalez* v. *Derrington* (1961) 56 Cal.2d 130, 133 [14 Cal.Rptr. 1, 363 P.2d 1]; *Johnsen* v. *Oakland etc. R.* (1900) 127 Cal. 608, 609 [60 P. 170].) ■ Of course the breach of a statutory duty itself will often suffice to give rise to an inference from which a jury may find that a given injury was the actual and proximate result of the violation. (See, e.g., *Lucas* v. *Hesperia Golf & Country Club* (1967) 255 Cal.App.2d 241, 252 [63 Cal.Rptr. 189]; *Lindsey* v. *De Vaux* (1942) 50 Cal.App.2d 445, 454-455 [123 P.2d 144]; *Rovegno* v. *San Jose Knights of Columbus Hall Assn.* (1930) 108 Cal.App. 591, 595 [291 P. 848].) The jury returned a verdict for defendants, however, and defendants now argue that in the light of this verdict, we must infer that the jury concluded that plaintiffs failed to establish the requisite causal relationship between any of the negligent violations and the fatal accidents.

Plaintiffs, however, contend here, as they did before the trial court, that the evidence established as a matter of law that defendants' breach of the most significant safety regulation—the statutory lifeguard requirement—was a proximate cause of the deaths and that the issue properly should not have been submitted to the jury at all. ■ For the reasons discussed below, we have concluded that after plaintiffs proved that defendants failed to provide a lifeguard or to post a warning sign, the burden shifted to defendants to show the absence of a lifeguard did not cause the deaths. Because these respective burdens were not clear at the time of the initial trial, we have determined that justice will best be served by a remand of the cause for a new trial.

---

requirements of section 7820 of title 17 of the California Administrative Code. They contend that under that regulation defendants were negligent in not closing their pool and that the jury should have at least been permitted to determine whether such negligence was a proximate cause of the accidents. In view of our conclusions with respect to plaintiffs' other contentions, however, we do not reach this issue.

a. *Under section 24101.4 pool owners who fail either to provide lifeguard services or to post a sign warning of the absence of a lifeguard are, as a matter of statutory policy, responsible for the consequences attributable to a failure to provide lifeguard services.*

Section 24101.4 of the Health and Safety Code provides that for swimming pools such as the one involved in the instant case "lifeguard service shall be provided or signs shall be erected clearly indicating that such service is not provided."[8] The evidence clearly establishes that defendants neither provided "lifeguard service"[9] nor erected a sign warning of the absence of a lifeguard. At trial plaintiffs requested an instruction that defendants' violation of this section was a proximate cause of the deaths of the two Hafts as a matter of law. Plaintiffs argued that since defendants had failed to comply with the alternative of erecting a sign, they were under a mandatory obligation to provide lifeguard service; given this duty, plaintiffs urged that any reasonable jury would be compelled to conclude from the facts disclosed at trial that the presence of a reasonably attentive lifeguard would have averted the tragedies.[10] The merit of plaintiffs' argu-

[8]Section 24101.4 reads in full: "Lifeguard service shall be provided for any public swimming pool which is of wholly artificial construction and for the use of which a direct fee is charged. For all other swimming pools, lifeguard service shall be provided or signs shall be erected clearly indicating that such service is not provided." Plaintiffs apparently concede that defendants' pool falls into the category governed by the second sentence of the section.

[9]Section 24100.1 defines "lifeguard service" as "the attendance, at all times that persons are permitted to engage in water contact sports [e.g., pleasure swimming], of one or more lifeguards who hold Red Cross or YMCA senior lifeguard certificates or have equivalent qualifications and who have no duties to perform other than to superintend the safety of participants in water contact sports."

[10]When submitting their formal instructions plaintiffs did not request that the court specifically instruct the jury that defendants' duty under section 24101.4 was simply to provide a lifeguard; instead, plaintiffs only submitted an instruction which set out the terms of section 24101.4 verbatim, without any explanation of which of the alternatives was appropriate. The trial judge, though modifying plaintiffs' instruction in some respects, read the jury the full text of secton 24101.4, thus leaving the jurors free to speculate on the proper interpretation of this provision, a matter which is clearly a question of law.

The difficulties arising in this case bear witness to the dangers inherent in this common practice of drafting instructions which merely repeat the terms of a statute verbatim. We join with the Hawaii Supreme Court in "admonish[ing] counsel against the practice of having statutes (whether in form of ordinance or otherwise) read as charges to the jury. The purpose of instructions is to present and explain to a jury the law of a case. This we believe can be better accomplished by non-legal and less formal instructions which may be more easily understood by laymen." (*Radford* v. *Morris* (Hawaii 1970) 472 P.2d 500, 504.)

Although some question arises whether plaintiffs can now complain of the ambiguous wording of an instruction which was, in effect, given at their request (compare *Devincenzi* v. *Faulkner* (1959) 174 Cal.App.2d 250, 253 [344 P.2d 322, 74 A.L.R.2d 764] with *Tyre* v. *Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 405 [6 Cal.Rptr. 13, 353 P.2d 725]), plaintiffs clearly are not precluded from challenging the court's initial

ment turns initially on the accuracy of their reading of the duty imposed by section 24101.4.

In 1959, the Legislature, recognizing the considerable hazards emanating from the growing number of unregulated swimming pools that were maintained in various health and recreational facilities throughout our state, enacted sections 24000-24109 of the Health and Safety Code as a general regulatory framework for the promulgation and the supervision of public swimming pool health and safety standards. Although the Legislature chose to delegate the authority to promulgate almost all of the specific regulations to the State Department of Public Health (Health & Saf. Code, § 24102), the Legislature was sufficiently concerned about one particular safety issue —lifeguard service—that it elected to establish the prevailing requirements itself, in section 24101.4. ■ That section recognizes that a primary obligation of "public" pool ownership is the maintenance of adequate "lifeguard service;" the section, however, does permit owners of certain public pools to satisfy their primary duty of providing "lifeguard services" by erecting a sign "clearly indicating" that no lifeguard is on duty.

Defendants suggest that since their pool falls into the category of pools in which the statutory obligation would be satisfied by the posting of an adequate sign, the consequences of their failure to meet the statutory demands ought to be limited to harm caused by the non-erection of the warning notice. ■ The language of the section makes clear, however,

---

refusal to take the issue of negligence and proximate causation away from the jury on these grounds. In earlier argument to the trial court plaintiffs' counsel explicitly contended that defendants' negligence had to be measured in terms of the failure to provide a lifeguard and that, given this negligence, proximate cause followed as a matter of law.

Counsel initially put forth his argument in moving for a directed verdict on the issue of liability; he stated: "[T]he basis for the instruction on liability as a matter of law is that if these regulations were complied with regarding these matters there would have been of necessity a lifeguard who had to be there because there was no warning sign and with the evidence that there were only two people in the pool with a lifeguard in attendance he either would have saved them or he would have been as a matter of law negligently inattentive. . . ."

When the trial court indicated it would not take the entire issue of liability from the jury, counsel requested that the judge instruct the jury that defendants were negligent and that their negligence was a proximate cause of the deaths as a matter of law. In explaining this request, counsel stated that he felt that "there is no basis upon which any reasonable person can differ that if the regulations were complied [with,] *without repeating what I said on the matter of the motion of liability,* that if these regulations were complied with, then the only reasonable deduction therefrom would be that they were negligent." (Italics added.)

This statement and the complete dialogue between court and counsel (quoted at fn. 6 *supra*), clearly indicate that plaintiffs contended that defendants' negligence *in not providing a lifeguard* was a proximate cause of the deaths, as a matter of law, and requested an instruction to that effect. On this appeal plaintiffs therefore are free to utilize this ground in challenging the judge's refusal to take the issue from the jury.

that the underlying requirement of this statute, for pools of *either* category, is the provision of "lifeguard service," and we believe that the legislative intent would be nullified if a pool owner were permitted to avoid this important requirement by pointing to the fact that he *failed* to comply with the statutory substitute as well.[11]

Defendants' factual argument in this case duly illustrates the manner in which the protection afforded by section 24101.4 would be undermined by an adoption of their interpretation of this requirement. Although they failed to fulfill either statutory alternative, defendants attempt to avoid liability by contending that since the decedents were the only people in the pool area, the absence of a lifeguard must have been obvious; if the absence of a lifeguard was obvious, the argument continues, defendants' failure to post a sign notifying decedents of this absence could be of no significance. Defendants thus conclude that this negligence was not a "proximate cause" of the resulting injury. We have no doubt that this is an argument which would commonly be made by noncomplying pool owners in such cases.

Although there is some superficial persuasiveness in such a position, the main strength of the argument derives not from its own merit but, instead, from the difficulty of proof facing an injured party attempting to counter this position. ■ The sign required by section 24101.4 and California Administrative Code, title 17, section 7829 (see fn. 3, *supra*) does considerably more than indicate to potential swimmers that no lifeguard is present. It gives notice of the general hazards present in the given swimming pool and most importantly serves as a *continuing warning* of the potential danger to the novice swimmer; the mere absence of a lifeguard hardly provides such cautionary advice.[12]

A pool owner, however, can facilely assert that a given individual would have gone in swimming even if there had been a "no lifeguard" sign posted; it is quite difficult in contrast, for a plaintiff, especially in a wrongful death action, to prove that a warning sign would have had the intended cautionary effect. We do not believe that the Legislature, in giving some pool owners the option of fulfilling the lifeguard requirement by posting an adequate sign, intended, in effect, to withdraw the protection of section 24101.4 in a significant percentage of all cases. Yet, because of the uncertainty surrounding the

---

[11]The Legislature could easily have simply required the second category of pools merely to post a sign stating that no lifeguard was provided, if that is what was intended. Instead the section clearly sets out the provision of lifeguard services as a duty of both categories of pools.

[12]Moreover, the necessity of such a warning is considerably magnified when, as in the instant case, the pool owner has failed to provide any markings to indicate the depth of the pool.

probable effectiveness of a sign, such substantial eradication of the provision would be the practical result of an adoption of defendant's construction of section 24101.4. In view of the ease with which a pool owner can comply with this section, we cannot choose defendants' construction and remain faithful to the salutary policies underlying this provision.

Moreover, as stated above, to hold that a pool owner, who has failed to satisfy either of the section's alternative requirements, may limit his liability to that resulting from his "lesser" failure to erect a sign, would of course effectively read out of the section the primary requirement of providing "lifeguard service." ■ To avoid this undermining of the vital purposes underlying the lifeguard provision, we interpret the section as requiring that the liability of a pool owner, who has neither provided a lifeguard nor erected a warning sign, be measured with respect to his wrongful omission to provide lifeguard services. The Court of Appeal so held in *Lucas* v. *Hesperia Golf & Country Club* (1967) 255 Cal.App.2d 241, 251 [63 Cal.Rptr. 189], and we concur in that conclusion.

 b. *Upon defendants' failure to provide lifeguard services, the burden shifted to them to prove that their violation was not a proximate cause of the deaths; in the absence of such proof, defendants' causation of such death is established as a matter of law.*

Defendant's failure to provide lifeguard service is of course only of consequence if such negligence was a "proximate cause" of either or both of the drownings at issue in the instant case. In view of the absence of any direct evidence on the actual events which resulted in the deaths of the father and son, the problem of "causation" has loomed large in this case from the very outset.

In analyzing this "causation" issue, we must preliminarily reject defendants' contention that the alleged negligence of Mr. Haft could properly be considered as an "intervening" and "superseding" cause which "broke the chain of proximate causation" with respect to the deaths of father or son.[13] ■ Without doubt, one of the principal dangers in swimming pools that the statutory lifeguard requirement sought to control, was the danger to careless

---

[13]Since the risk of swimming pool drownings constituted the very hazard against which the statutory lifeguard requirement was designed to protect, there of course can be no question but that the instant actions embodied a foreseeable "type of injury" (cf., e.g., *Nunneley* v. *Edgar Hotel* (1950) 36 Cal.2d 493, 497 [225 P.2d 497]; Rest. 2d Torts, § 286(c), com. i). Similarly, decedents, as motel guests and expected users of the pool, just as clearly fell within the precise class of "foreseeable victims" whom the statute sought to protect (see *Lucas* v. *Hesperia Golf & Country Club* (1967) 255 Cal.App.2d 241, 251 [63 Cal.Rptr. 189]; accord *Porter* v. *Montgomery Ward & Co., Inc.* (1957) 48 Cal.2d 846, 848-849 [313 P.2d 854]; *Di Muro* v. *Masterson Trusafe Steel Scaffold Co.* (1961) 193 Cal.App.2d 784, 791 [14 Cal.Rptr. 551].)

swimming novices who might negligently overrate their aquatic skills. ██ That some swimmers would be imperiled through their own negligence was clearly one of the foreseeable risks which motivated the issuance of section 24101.4's requirements; under recognized principles (see, e.g., *Stewart* v. *Cox* (1961) 55 Cal.2d 857, 863-864 [13 Cal.Rptr. 521, 362 P.2d 345]; *McEvoy* v. *American Pool Corp.* (1948) 32 Cal.2d 295, 298-299 [195 P.2d 783]; Rest. 2d Torts, § 447), such negligence could not properly be designated as a "superseding cause" which would automatically relieve defendant of all liability.[14]

The fallacy of defendants' contention as to "superseding cause" is perhaps most clearly illuminated by its application to the cause of action relating to the death of five-year-old Mark. In that context the claim that defendants' responsibilty to Mark was "cut off" by Mr. Haft's alleged negligence is in reality no more than an attempt to resurrect the doctrine of "imputed contributory negligence" between a minor and his parent, a theory which the California courts have long repudiated. (*Crane* v. *Smith* (1943) 23 Cal.2d 288, 295 [144 P.2d 356]; *Zarzana* v. *Neve Drug Co.* (1919) 180 Cal. 32, 34-37 [179 P. 203, 15 A.L.R. 386].)[15] The "imputed contributory negligence"

---

[14]This reasoning is not to imply, however, that Mr. Haft's negligence, if any, could not be considered a bar to his recovery under a contributory negligence defense. Although plaintiffs did not contend at trial, or on appeal, that the contributory negligence of the decedents, if proven, should not be available as a defense to liability, an amicus brief filed with this court urges us to hold, as a matter of public policy, that contributory negligence may not be relied on as a defense by one who is negligent by virtue of a violation of the various swimming pool regulations at issue in this case. Full analysis of this contention, however, would require a substantial reevaluation of an entire line of California cases which have generally permitted contributory negligence, as distinguished from assumption of risk (see e.g., *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 430-431 [218 P.2d 17]; *Bickham* v. *Southern Cal. Edison Co.* (1953) 120 Cal.App.2d 815, 823-824 [263 P.2d 32]), to be asserted as a defense in an action grounded in the violation of a safety statute (see *Alber* v. *Owens* (1967) 66 Cal.2d 790, 798 [59 Cal.Rptr. 117, 427 P.2d 781]; *Mason* v. *Case* (1963) 220 Cal.App.2d 170, 177-179 [33 Cal.Rptr. 710]; *Mula* v. *Meyer* (1955) 132 Cal.App.2d 279, 284-285 [282 P.2d 107]). We do not believe the instant litigation, in which plaintiffs have not even raised the issue, provides a proper vehicle for such an undertaking.

[15]Although the instant wrongful death actions are maintained on behalf of the mother and daughter, rather than for an injured child, defendants do not contend that any contributory negligence of Mr. Haft may be imputed to the present plaintiffs to bar their recovery. The case of *Flores* v. *Brown* (1952) 39 Cal.2d 622, 629-632 [248 P.2d 922], squarely supports this position. As the court in *Flores* noted, the negligence of one spouse which contributes to the injury of a child has been imputed to the other spouse to bar recovery when suit is instituted on behalf of the *community* (*Crane* v. *Smith* (1943) 23 Cal.2d 288, 301 [144 P.2d 356]; *Kataoka* v. *May Dept. Stores Co.* (1943) 60 Cal.App.2d 177, 188-189 [140 P.2d 467]). When the negligent spouse dies in the accident and thus will in no way benefit from any recovery received with respect to the child's injuries, however, no logical basis can support the application of the "imputed contributory negligence" rule to a wrongful death action maintained by the surviving non-negligent spouse or by a non-negligent child. In such a case the wrongful

formula transferred the negligence of a parent (in not carefully supervising his child, for example (see *Hartfield* v. *Roper* (N.Y. 1838) 21 Wend. 615) to a plaintiff child so as to bar the child's recovery against an admittedly negligent defendant; defendants seek to obtain a like dispensation through the jury's application (in reality, misapplication) of the nebulous "superseding cause" doctrine. This argument has no more merit phrased in "superseding cause" terms than it had in the context of "imputed contributory negligence." (See *Adamson* v. *Traylor* (1962) 60 Wn.2d 332, 335-336 [373 P.2d 961, 963]; Rest. 2d Torts, § 452(1), com. b.)[16]

Our rejection of defendants' "superseding cause" theory, however, does not in itself resolve the question of whether, on the basis of the facts adduced at trial, the absence of a lifeguard was a proximate cause of the deaths as a matter of law.[17] The troublesome problems concerning the causation issue in the instant case of course arise out of the total lack of direct evidence as to the precise manner in which the drownings occurred. Although the paucity of evidence on causation is normally one of the burdens that must be shouldered by a plaintiff in proving his case, the evidentiary void in the instant action results primarily from defendants' failure to provide a lifeguard to observe occurrences within the pool area. The main purpose of the lifeguard requirement is undoubtedly to aid those in danger, but an attentive guard does serve the subsidiary function of witnessing those accidents that do occur. The absence of such a lifeguard in the instant case thus not only stripped decedents of a significant degree of protection to which they were entitled, but also deprived the present plaintiffs of a means of definitively establishing the facts leading to the drownings.

---

death suit is not brought on behalf of the negligent parent's community interest, but rather is instituted solely on behalf of a non-negligent relative's interest; there is no more reason to "impute" negligence to such a plaintiff than there is to impute negligence to the injured child. Thus the court properly instructed the jury in this case that Mr. Haft's contributory negligence, if any, would not bar the plaintiff's recovery in connection with Mark's death.

[16]*Akins* v. *County of Sonoma* (1967) 67 Cal.2d 185, 198-199 [60 Cal.Rptr. 499, 430 P.2d 57], is not inconsistent with the above conclusion. The majority in *Akins* suggested that on the facts before it the negligence of the injured child's parents could conceivably constitute a "superseding" cause, but only if it were found (1) that the parents' negligence was not foreseeable to defendants, *and* (2) that the resulting injury was not "of a type which was foreseeable." In the instant case it is clear that even if Mr. Haft were negligent, that negligence was one of the foreseeable risks against which the lifeguard requirement was designed to protect. Moreover, it is of course obvious that Mark's drowning is precisely an injury "of a type which was foreseeable."

[17]It should be emphasized that the defense verdict in this case did not embody a jury finding that the failure to provide a lifeguard was *not* a cause of the deaths, because the jury was never instructed that defendants' negligence should be viewed as the failure to provide a lifeguard. Although plaintiffs neglected to request such an instruction, it would be misleading to consider this "causation" question as one which had been rejected by the jury.

 Clearly, the failure to provide a lifeguard greatly enhanced the chances of the occurrence of the instant drownings. In proving (1) that defendants were negligent in this respect, and (2) that the available facts, at the very least, strongly suggest that a competent lifeguard, exercising reasonable care, would have prevented the deaths,[18] plaintiffs have gone as far as they possibly can under the circumstances in proving the requisite causal link between defendants' negligence and the accidents. To require plaintiffs to establish "proximate causation" to a greater certainty than they have in the instant case, would permit defendants to gain the advantage of the lack of proof inherent in the lifeguardless situation which they have created. (See Fleming, An Introduction to the Law of Torts (1967) p. 111; cf. Malone, *Ruminations on Cause-In-Fact* (1956) 9 Stan.L.Rev. 60, 77.) Under these circumstances the burden of proof on the issue of causation should be shifted to defendants to absolve themselves if they can.

The case of *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91] provides a close analogy. In *Summers* two hunters (the co-defendants) fired their guns simultaneously; one pellet of shot hit a third hunter (the plaintiff) whom the others should have known to be dangerously near their line of fire. Recognizing the impossibility of plaintiff's task of demonstrating which of the defendants had actually caused his injury, this court declared that, as a matter of fairness and in view of the parties' relative fault, "a requirement that the burden of proof on that subject be shifted to defendants becomes manifest." (33 Cal.2d at p. 86.)

In explaining the basis of our decision in *Summers,* we pointed out that the practical difficulties facing the plaintiff bore considerable similarity to the problems we had earlier addressed in the celebrated case of *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]. In *Ybarra* the plaintiff sustained an injury while unconscious on an operating table in a hospital, and was confronted with the formidable task of proving which of the many doctors and attendants who had participated

---

[18]Uncontradicted evidence at trial established that the pool in which decedents drowned was a relatively small motel pool. Mr. Haft and Mark were the only two persons in the entire pool area and thus a reasonably attentive lifeguard would without doubt have been aware of their activities at the moment that the instant emergency arose. Under these facts, the chances of a successful rescue appear to be very high; indeed, in our view this record comes very close to, and may well succeed in, establishing that the absence of a lifeguard was an actual cause of the deaths as a matter of law even without a shift in the burden of proof (see *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 723, 726-727 [344 P.2d 307]; *Gallichotte* v. *California Mut. etc. Assn.* (1935) 4 Cal.App.2d 503, 508-509 [41 P.2d 349].) Because the action must in any event be retried on the issue of Mr. Haft's alleged contributory negligence, however, we believe that a full and balanced disposition of the matter can best be achieved by a retrial of all aspects of this action. At the retrial, the parties will be more fully advised of the respective burdens which each must bear.

in the operation were responsible for his injury. In view of the magnitude and unfairness of this burden, we found that under res ipsa loquitur, plaintiff could maintain his claim against all the persons who had any connection with the operation, even though he could not select which particular person or which particular acts led to his injury, and we placed the burden on the individual defendants to demonstrate their non-involvement. As we noted in *Summers,* although "[in *Ybarra*] the court was considering whether the patient could avail himself of res ipsa loquitur, rather than where the burden of proof lay . . . *the effect of the decision is that plaintiff has made out a case when he has produced evidence which gives rise to an inference of negligence which was the proximate cause of the injury. It is up to defendants to explain the cause of the injury.*" (33 Cal.2d at pp. 86-87 (italics added).)

The relative culpability of the parties and the burden facing plaintiffs in the instant case are comparable to the circumstances disclosed in *Summers* and *Ybarra.* Here, defendants made the lifeguardless pool available for the use of the Hafts and the precise injury that the statutory provision was intended to prevent occurred; defendants thus clearly are at least as culpable as the defendants in *Summers* or *Ybarra.* Because no persons witnessed the drownings (in part a result of the very negligence at issue) and because neither of the victims survived, plaintiffs can no more adduce definitive evidence of causation than the injured hunter in *Summers* or the unconscious patient in *Ybarra.* In view of the relative positions of the parties, and a factual setting that establishes a significant probability of a successful rescue, considerations of "policy and justice," as in *Summers,* shift the burden to "defendants to absolve [themselves] if [they] can." (33 Cal.2d at p. 88.)

Indeed, in some respects the instant action presents a stronger case for shifting the burden of proof to defendants than *Summers,* because the present defendants are in a sense more "culpably" responsible for the uncertainty of proof than were the hunters in *Summers.* Although the difficulty in proof in *Summers* was attributable to the coincidence of the defendants' actions, each hunter was negligent, *not* because he shot simultaneously with the other defendant, but only because he shot in the direction of the plaintiff. In other words, the uncertainty of proof in that situation, while emanating from defendants' conduct, was not a foreseeable consequence of defendants' negligence. In the instant case, on the other hand, the absence of definite evidence on causation is a direct and foreseeable result of the defendants' negligent failure to provide a lifeguard. Defendants may thus

more appropriately be designated at "fault" for the factual deficiencies that are present.[19]

Moreover, our conclusion draws additional support from sources other than *Summers* and *Ybarra,* for the judiciary has responded to the uncertainties of proof inherent in a variety of parallel situations by shifting the burden of proof to a clearly negligent party. Thus, for example, when a plaintiff's injuries result from a combination of a tortfeasor's negligence and an innocent cause but the injuries are not readily susceptible to allocation between the two, our courts have required the negligent party to bear the burden of proving the extent of the damages resulting from his conduct (see *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 705 [39 Cal.Rptr. 64]; Prosser, *Proximate Cause in California* (1950) 38 Cal.L.Rev. 369, 388-389); if he cannot sustain that burden, he is held liable for the entire loss. Similarly, when several negligent automobile drivers, not acting in concert, successively collide with a plaintiff's person or his property, and the resulting damage is not capable of apportionment, the burden "shifts to *any defendant who might have contributed to the injuries* to prove his own *innocence* or limited liability by showing that such injuries or some particular injury did not result from his negligent conduct." (Italics added.) (100 A.L.R.2d 16, 59 (summarizing the rule of *Cummings* v. *Kendall* (1940) 41 Cal.App.2d 549, 558-559 [107 P.2d 282]; *Copley* v. *Putter* (1949) 93 Cal.App.2d 453, 457-458 [207 P.2d 876]; *Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 607-608 [315 P.2d 19]; and *Apodaca* v. *Haworth* (1962) 206 Cal.App.2d 209, 214-215 [23 Cal.Rptr. 461]).)

Without such a shift in the burden of proof in the instant case, the promise of substantial protection held out by our statutory lifeguard requirement will be effectively nullified in a substantial number of cases. ██ One purpose of the statute is to prevent a drowning in a pool where no one else is present to witness it and possibly to prevent it. If the pool owner can disregard the statute and retreat to the sanctuary of the argument that the

---

[19]Justice Traynor characterized the *Summers'* shift of the burden of proof as "based on the policy that it is preferable to hold liable a negligent defendant who did not in fact cause the injury than to deny an innocent plaintiff any remedy when it cannot be determined which of the defendants is responsible for the harm but it appears that one of them was." (*Vasquez* v. *Alameda* (1958) 49 Cal.2d 674, 682-683 fn. 2 [321 P.2d 1], (Traynor, J. dissenting).)

In parallel terms, the shift of the burden of proof in the instant case may be said to rest on a policy judgment that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove "proximate causation" conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury.

plaintiff must prove the "cause" of the death which obviously is unknown, he can, without liability, expose his paying patron to the very danger that the statute would avoid. ▮▮▮ Since the pool-owner violates the statute, since he creates the dangerous condition and exercises control over it, since the death occurs upon his premises with which he is familiar, since he profits from the presence of the pool, he cannot take refuge in the position that the burden of proof rests with the probable victim of his statutory violation.[20]

▮▮▮ Under the facts presented at the initial trial defendants did not sustain their burden on this issue and thus theoretically the court erred in declining to take the matter from the jury. Because the obligation of defendants to bear the burden on this issue was not clearly defined at the time of the trial, however, principles of fairness counsel that defendants be afforded the opportunity of meeting that burden of proof. (Cf. *Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 366, fn. 18 [82 Cal.Rptr. 337, 461 P.2d 617].) Under these circumstances, we reverse the judgment and remand the case for a new trial, at which both parties will be fully advised as to their respective burdens. In the succeeding sections of this opinion, we discuss two additional issues raised by plaintiffs that are likely to recur at a new trial.

3. *The trial court erred in refusing to instruct the jury that Mark Haft was not contributorily negligent as a matter of law.*

▮▮▮ At trial plaintiffs requested an instruction that "the evidence in this case fails to show any negligence on the part of the decedent Mark Brian Haft. . . ." The trial judge refused to give this instruction, but instead instructed the jury, on defendants' request, that "if you find from a preponderance of the evidence that *either decedent* was guilty of negligence which contributed as a proximate cause of his death, no recovery of damages may be had by *the plaintiffs for the death of that decedent who*

---

[20]This result is also consistent with the emerging tort policy of assigning liability to a party who is in the best position to distribute losses over a group which should reasonably bear them. (See, e.g., *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251-252 [85 Cal.Rptr. 178, 466 P.2d 722]. See generally Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts* (1961) 70 Yale L.J. 499.) In the instant case the defendant motel owner, and more generally the entire class of those who frequent defendants' motel, were, in an economic view, the beneficiaries of the "cost savings" accompanying the nonemployment of a lifeguard. It is better that this entire group bear the burden of the loss resulting from this "economy," rather than to require one particular guest to absorb the entire loss. By assigning liability to the motel in those cases in which no direct evidence establishes causation, we make sure that all motel guests bear their fair share of these damages, since the motel owner is likely to treat either the costs of liability insurance, or the actual costs of litigation, as a direct expense of its business and establish its fees accordingly.

*was contributorily negligent. . . ."* (original italics). We agree with plaintiffs' contention that on the evidence presented the trial court erred in failing to give the instruction which they requested.

We note initially that plaintiffs do not suggest that they were entitled to the requested instruction simply by virtue of Mark's tender age (see *Courtell* v. *McEachen* (1959) 51 Cal.2d 448, 454 [334 P.2d 870]; *Christian* v. *Goodwin* (1961) 188 Cal.App.2d 650, 652-655 [10 Cal.Rptr. 507]; cf. *Brown* v. *Connolly* (1965) 62 Cal.2d 391, 395 [42 Cal.Rptr. 324, 398 P.2d 596, 11 A.L.R.3d 1348]); rather plaintiffs ground their contention on the failure of defendants to introduce sufficient evidence with respect to an issue on which defendants bore the burden of proof. ▮ Under traditional standards plaintiffs were entitled to have the question of Mark's contributory negligence withdrawn from the jury if "disregarding conflicting evidence and giving to [defendants'] evidence all the value to which it is legally entitled . . . the result is a determination that there is no evidence of sufficient substantiality to support" a finding that the drowned child was contributorily negligent. (Accord, *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].) ▮ " 'In order to justify the submission of any question of fact to a jury, the proof must be sufficient to raise more than a mere conjecture or surmise that the fact is as alleged. It must be such that a rational . . . mind can reasonably draw from it the conclusion that the fact exists, and when the evidence is not sufficient to draw such inference, the court should refuse to submit the question to the jury.' [Citations]." (*In re Calkins* (1896) 112 Cal. 296, 306 [44 P. 577]; see *Bardin* v. *Case* (1950) 99 Cal.App.2d 137, 142-143 [221 P.2d 292] (evidence insufficient to warrant instruction on contributory negligence); *Stoneburner* v. *Richfield Oil Co.* (1931) 118 Cal.App. 449, 455-456 [5 P.2d 436] (same).)

▮ Although some evidence indicated that Mark was not a good swimmer and possibly demonstrated that Mark was sufficiently familiar with swimming pools to appreciate their potential dangers to him *if he were by himself,* all the testimony presented at trial disclosed that Mark was *not* by himself but, instead, under the direct care and supervision of his father. Even if a child of Mark's age, size, intelligence and capacity should reasonably have been aware of the dangers of the pool, no one could reasonably find such a child "negligent" in entering the pool under his parent's instruction and guidance. Although we might take judicial notice of the increasing tendency of children to question and challenge their parents, surely even the most "liberated" five-year old cannot reasonably be expected to reject a father's invitation to play with him in the "adult" swimming pool.

A careful review of the California precedent and of the case law of our sister states has not disclosed a single instance in which a young child was found negligent while following the instructions of his parent; rather, minor children have been held contributorily negligent only in situations in which the child was acting either without or contrary to parental or similar guidance. (E.g., *O'Keefe* v. *South End Rowing Club* (1966) 64 Cal.2d 729 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]; *Martinovic* v. *Ferry* (1963) 222 Cal.App.2d 30, 35 [34 Cal.Rptr. 692]; *Juhas* v. *American Casualty Co.* (La.App. 1962) 140 So.2d 676, 678-679; *Fox* v. *Mission of the Immaculate Virgin* (1955) 285 App.Div. 898 [138 N.Y.S.2d 17].) In cases in which an accident occurred while a parent was in direct control of the child's actions, courts have traditionally analyzed the propriety of permitting a defense of contributory negligence only in terms of the viability of the doctrine of "imputed contributory negligence," which imputes the negligence of the *parent* to the child to bar recovery (see, e.g., *Crane* v. *Smith* (1943) 23 Cal.2d 288, 301 [144 P.2d 356]; *Kataoka* v. *May Dept. Stores Co.* (1943) 60 Cal.App.2d 177, 188-189 [140 P.2d 467]; *Marino* v. *Kane* (S.D.N.Y. 1955) 131 F.Supp. 758, 761).[21] In looking only to the negligence of the controlling parent in these instances, the numerous decisions reflect a generally[22] unspoken premise that a child, obeying the directions of his parent, cannot reasonably be found to be negligent in his own right.

Perhaps this premise has remained unarticulated only because of its obviousness; whatever the reason, on the facts of this case the validity of such a premise is clear. ■ From all the available information, Mark only entered the large pool, where he met his death, with the consent and under the direction of his father and remained in the pool only under the most direct supervision of his parent. Viewing these facts in the light most favorable to defendants, we cannot find evidence of sufficient substantiality to support a finding of Mark's contributory negligence. In the event that equivalent evidence is presented at a new trial, plaintiffs would be entitled to have this issue withdrawn from the jury's consideration.

---

[21]As we have pointed out above, California has long repudiated the application of the "imputed contributory negligence" doctrine in these circumstances. (*Zarzana* v. *Neve Drug Co.* (1919) 180 Cal. 32, 34-37 [179 P. 203, 15 A.L.R. 386].)

[22]In *Boehm* v. *City of Detroit* (1905) 141 Mich. 277, 280 [104 N.W. 626, 627], a four-year-three-month-old child, while walking along a sidewalk between his mother and father and holding his father's hand, stepped into a large hole in the sidewalk and fell against his father with considerable force. In taking the issue of contributory negligence from the jury, the trial judge, after charging that "no negligence of the parents . . . can be imputed to the boy" added: "I also charge you that a boy of that age . . . *who is being led by his father,* cannot be guilty of contributory negligence." (Italics added.) On appeal, the Michigan Supreme Court approved this instruction.

### 4. The trial judge erred in excluding two department of health inspection reports which were relevant to the issue of wilful misconduct.

Plaintiffs also contend that the trial judge erred in excluding two department of health inspection reports which they claim were essential to the issue of defendants' "wilful and wanton misconduct."[23] Mr. Harrison, an inspector employed by the Riverside County Health Department, testified for the plaintiffs that he had made inspections of the Lone Palm Hotel pools on December 29, 1959, April 13, 1960 and September 21, 1961. Referring to carbon copies of the three inspection forms, he stated that entries on them indicated that, on all of those three dates, the inspected pool did not have any of the required life saving and safety equipment. Mr. Harrison also testified that routinely, when delivering the reports to pool operators, he explained the full requirements of the safety regulations which had not been met.[24]

 Although the trial court initially admitted the three inspection reports into evidence, shortly thereafter the court reversed its decision with respect to the earlier two reports when it developed on *voir dire* of the inspector, that he could not be certain whether those two reports related to the "west pool" or the "east pool" of the motel. The court indicated that this uncertainty rendered the reports "too remote" to be relevant, and instructed the jury to disregard them and the inspector's testimony relating to them completely.

Plaintiffs objected to this ruling, contending that even if the reports did refer to the "east pool" they were still equally relevant to the issue of the defendants' actual knowledge of the safety requirements, assertedly the only issue for which the reports had been offered. These earlier inspection reports became significant, plaintiffs' counsel explained, because they demonstrated defendants' knowledge of the requirements over a considerable period of time, from which the jury could conclude that the defendants' noncompliance amounted to "wilful and wanton" conduct. Plaintiffs explicitly urged the court to admit this evidence with the cautionary instruction that the reports were not to be considered as probative on the issue of the actual condition of the west pool at the time of the accident. Nevertheless, the trial court refused to admit the reports. This refusal was erroneous.

---

[23] In addition to their negligence claim, plaintiffs argued that the magnitude of defendants' knowing violation of all the safety regulations rose to the level of "wilful and wanton" misconduct. Under the "wilful and wanton misconduct" theory the alleged contributory negligence of Mr. Haft would not be an available defense.

[24] Although it does not appear that Mr. Harrison delivered the reports directly to Mrs. Blackburn, the manager primarily responsible for the operation of the motel, Mrs. Blackburn admitted that, although she could not remember the particular reports, everything that came to the motel went across her desk. Mrs. Blackburn had earlier testified that the inspectors "always found things wrong. That was their job."

As plaintiffs suggest, the concept of "wilful and wanton misconduct" often involves an evaluation of the state of mind of the defendant (see, e.g., *Emery* v. *Emery* (1955) 45 Cal.2d 421, 426 [289 P.2d 218]; *Studer* v. *Plough* (1960) 179 Cal.App.2d 436, 440-441 [3 Cal.Rptr. 785]); evidence that the defendant actually knew that he was violating a safety regulation, or in this case numerous safety regulations, is surely relevant, though not indispensable (*Olea* v. *Southern Pacific Co.* (1969) 272 Cal.App.2d 261, 265-266 [77 Cal.Rptr. 332]; *Pelletti* v. *Membrila* (1965) 234 Cal.App.2d 606, 611 [44 Cal.Rptr. 588]), to prove the gross culpability of "wilful and wanton" conduct. Moreover, evidence that such knowing violation continued over a considerable period of time, without any excuse, would also be relevant to establishing "wilful and wanton misconduct" (cf. *Parsons* v. *Fuller* (1937) 8 Cal.2d 463, 465-466 [66 P.2d 430].) Although, as the trial court noted, defendants' ignorance of the regulations would not excuse their violation of these safety rules and thus any knowledge demonstrated by the earlier inspection reports would not be crucial to the negligence aspect of this case, plaintiffs' offer of proof specifically related to the "wilful and wanton" issue and, on this ground, the evidence should have been admitted. If plaintiffs so desire, they should be permitted at the new trial of this cause to introduce these inspection reports, for the limited purpose set out above.

The judgment of the Superior Court of Los Angeles County is reversed and the cause is remanded for further proceedings consistent with this opinion.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.