Filed 10/10/13  Jimenez v. Morbark CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| IRMA RENTERIA JIMENEZ, | B236208 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 416040) |
| v. | |
| MORBARK, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for the County of Los Angeles. William A. MacLaughlin, Judge.  Affirmed.

Steinbrecher and Associates, Edward Steinbrecher; Esner, Chang & Boyer and Stuart Esner for Plaintiff and Appellant.

Lewis Brisbois Brisgaard & Smith, Dana Alden Fox, Jason R. Chermela and Dawn M. Flores-Oster for Defendant and Respondent Morbark, Inc.

Grant, Genovese & Baratta, James M. Baratta and Lance D. Orloff for Defendant and Respondent Garvey Equipment Co.

_____

**SUMMARY**

This lawsuit brought by plaintiff Irma Renteria Jimenez involves the death of her husband, Rafael Jimenez, a tree trimmer for the City of Inglewood. Mr. Jimenez was pulverized when his body was drawn into the feed wheel of a brush chipper manufactured by defendant Morbark, Inc. One witness saw Mr. Jimenez's body being drawn into the brush chipper, but no one saw how Mr. Jimenez came to be in the feed chute of the machine. Plaintiff's theory was that Mr. Jimenez's gloved hand became entangled in the Chinese elm tree branches that he had been feeding into the chipper and he could not free himself. If the brush chipper had been equipped with a lower control bar or "knee bar," Mr. Jimenez's body would have hit the knee bar, automatically shutting off the brush chipper, and the accident would not have occurred. Defendant's theory was that Mr. Jimenez, contrary to safety instructions never to allow one's hands to enter the infeed spout, climbed onto the feed tray in order to clear a jam or otherwise to get the trimmings to feed into the feed wheel, and then was somehow caught by the feed wheel – a scenario in which a knee bar would not have prevented the accident.

After a bench trial, including receipt of expert testimony from both sides, the court concluded that plaintiff failed to establish that it was more likely than not that the absence of a knee bar was a substantial factor in causing Mr. Jimenez's death. The court concluded Morbark was negligent in the design of the chipper because of the failure to incorporate a knee bar, but its negligence was not a substantial factor in causing the harm.

On appeal, plaintiff makes two principal arguments. First, the court relied on an expert opinion that plaintiff maintains was premised on the speculation, with no foundation in the evidence, that Mr. Jimenez intentionally climbed up on the feed tray and was kneeling in the chipper when he was caught in the feed wheel. Second, even if reliance on the defense expert's opinion was proper, the opinion was premised on Mr. Jimenez acting unreasonably, and under Evidence Code section 521 – stating that "[t]he party claiming that a person did not exercise a requisite degree of care has the burden of proof on that issue" – defendants had the burden to prove Mr. Jimenez climbed

2

up on the feed tray, and did not do so.

We reject both contentions and affirm the judgment.

## FACTS

We begin with a description of the brush chipper, and then describe the circumstances surrounding the accident, the lawsuit, and the trial court's ruling and rationale. We quote liberally from the trial court's statement of decision in describing machinery and matters not in dispute.

### 1. The Brush Chipper

The Morbark brush or wood chipper is a mobile commercial machine mounted on a frame on a single axle. It may be hitched to a towing vehicle, as in this case, or it can stand on its own. "At its rear, it has a feed tray mounted on pivot points which permit [the feed tray] to rotate upward into a closed position when the machine is traveling or otherwise not in use. During use, the tray rotates down to essentially a level position which then permits access into the feed chute and extends the feed area to the rear of the machine." The feed tray is about 55 inches wide, and extends out 24 inches from the feed chute. The feed chute itself is 36 inches long, so there is a total distance of about 60 inches from the outer edge of the feed tray, along the feed chute, to the steel teeth of the feed wheel. The mouth of the feed chute, like the feed tray, is 55 inches wide. The feed chute is enclosed on all sides and becomes narrower as it approaches the feed wheel, helping to guide the brush and tree limbs into the feed wheel. In operation, the feed wheel rotates in the direction of the operator. It has eight rows of steel teeth that are about one and one-half inches long. The steel teeth "engage with the material to feed it into the cutting drum," where the trimmings are reduced to chips before being expelled through a discharge chute into the rear end of the towing vehicle.

In addition to operating controls on the side of the machine, the brush chipper has a "control bar." This is a continuous steel bar that extends around the two sides and the top of the feed chute. It is attached to the two sides and rises about five inches above the top of the feed chute. "This control bar has three positions which alternatively, through microswitches, can stop the movement of the feed wheel, cause it to rotate in its normal

3

forward operating mode or cause the feed wheel to reverse in direction. The chipper also had two pull cords mounted from the top of the interior of the feed chute that also operate microswitches which, when a cord is pulled, cause the feed wheel to stop immediately."

The Morbark chipper does not have a "lower control bar," often called a knee bar, a device present on many chippers manufactured by Vermeer, one of Morbark's competitors. The Vermeer knee bar is installed across the lower lip of the feed tray. It operates independently from other machine controls, and "would theoretically stop the feed wheel when an operator was caught by trimmings and being pulled into the machine." Because of its passive nature, "meaning that the operator does not have to perform an intentional act, it would theoretically eliminate the potential of the panic or diversion of the operator which could reduce the recognition and reaction time necessary to voluntarily operate the control bar mounted at the sides and top of the feed tray or the pull cords within the feed chute."

### 2.    The Accident

Mr. Jimenez had been employed by the City of Inglewood as a tree trimmer for a number of years. Tree trimmers worked in two-man crews. On the day of the accident, Mr. Jimenez and his usual partner, Juan Manuel Ortiz, had been working together all day. The accident occurred when they were working on 80th Street just east of 8th Avenue. Mr. Ortiz was in a lift device (referred to as a cherry picker) trimming Chinese elm trees, and Mr. Jimenez was collecting the trimmings that fell to the ground and feeding them into the chipper. The trial court described the testimony of the three persons who witnessed some portion of the events, as follows.

Mr. Ortiz "testified to the work they were performing but was unaware of the actual accident until after it occurred. He had been up in the cherry picker trimming tree branches and had seen [Mr. Jimenez] gathering trimmings in both arms and feeding them into the chipper from time to time but was unaware of anything having occurred until he heard the honking of an automobile horn and saw its operator, witness Charles Stroud, gesturing in some manner. [Mr. Ortiz] lowered himself to the ground and became aware that [Mr. Jimenez] was not there and then observed blood and other indications of the

4

accident. He was unaware of what [Mr. Jimenez] had been doing just before and at the time the accident occurred and doesn't know how he got into the chipper. He also testified to the training they had received on the use and operation of the chipper which included a video, reading of a manual, translation of warning stickers on the machine and training from the City on how to clear jams or other failures to feed, how to feed the machine from the side and to never put hands within the areas of the chute. [Mr. Ortiz] did state that it was common that only one person would be operating the chipper, that they often fed the machine from directly behind, rather than from the side, and that the operators did put their hands within the confines of the feed chute from time to time."

"James Woodson, a school crossing guard for the City of Inglewood schools, testified that he had been sitting in his car just north of the intersection of 80th Street and 8th Avenue waiting for the afternoon close of the school day and had observed the trimming work being done by [Mr. Ortiz] and [Mr. Jimenez]. From his observations, he was aware of the trimming and placing of the cuttings in the chipper and had seen [Mr. Jimenez] gathering the trimmings and bringing them to the back of the chipper and then would see him going back to the trimmings on the ground empty handed and return with more. However, because of the location of his vehicle and the truck in front of the chipper, [Mr. Woodson] was unable to see the actual feeding of the trimmings into the chipper and did not see the accident itself or the manner in which [Mr. Jimenez] became engaged with the machine. He was unaware of any accident having occurred until he heard [Mr. Ortiz] yelling and saw him come down to the ground. Woodson then walked over and saw the blood at the rear of, or around, the chipper."

The only witness who saw any part of the accident was Charles Stroud. Mr. Stroud was driving a vehicle westbound on 80th Street, approaching the area of the tree trimming, "when he saw [Mr. Jimenez] laying on the bed of the chipper at a 30 to 45 degree angle to the right with his right arm and shoulder caught. Based on what he saw, he testified that [Mr. Jimenez] had to be feeding the machine because branches were there and he was on the bed of the chipper. Thus, he had no doubt [Mr. Jimenez] was feeding the machine but said he did not actually see [Mr. Jimenez] feeding the machine.

5

In his deposition, Stroud had stated that it appeared [Mr. Jimenez] was feeding the machine and that he had told one of the police officers that he was. When questioned about his statement to two police officers who later arrived at the scene, he stated that he may have said that he saw [Mr. Jimenez] feeding the machine but that he didn't actually see that occur. In any event, he immediately started honking his horn to get the attention of [Mr. Ortiz] who was up in a tree and made eye contact with him and [Mr. Ortiz] began coming down. Stroud pulled up and stopped his car in the roadway by which time [Mr. Jimenez] was already going through the chipper before he could get out of his vehicle. He stated that he had no idea how [Mr. Jimenez] got in the position he was when Stroud first saw him and that he never saw [Mr. Jimenez's] feet on the ground. His entire body was within the confines of the chipper when Stroud first saw him."

Police Officer James Coury arrived about 10 minutes after the accident and spoke briefly with Mr. Stroud. Officer Coury made notes that were not direct quotes and did not record the conversation, but used the notes later to prepare a report. In the report, Officer Coury wrote that Mr. Stroud said he "observed two City of Inglewood vehicles parked along the north curb with one of the city workers feeding tree branches into the wood chipper." Mr. Stroud "said he thought something was wrong when the worker reached into the wood chipper. Fearing for the safety of the worker, Stroud began honking his horn to alert the other workers. He looked back to the worker in the wood chipper and saw his legs protruding from within the wood chipper."

Detective Kevin Lane arrived at the scene about an hour later. He interviewed Mr. Stroud, made some notes that were not direct quotes, and later relied primarily on his memory in preparing his report. The report stated: "Once [Mr. Stroud's] vehicle was directly next to [Mr. Jimenez], who was feeding the wood chipper with tree branches, he noticed his right arm appeared to have gotten lodged in the blades of the wood chipper. Moments later, he noticed [Mr. Jimenez's] upper body began to lean towards the blades. Stroud began to honk his horn [in] an attempt to get the other employee['s] . . . attention. Stroud then noticed that [Mr. Jimenez's] entire body had been cut up within the wood chipper."

6

### 3.     The Lawsuit

Plaintiff brought this lawsuit, individually, as Mr. Jimenez's successor in interest, and as guardian ad litem for their four minor children. Her wrongful death complaint alleged causes of action for strict product liability, negligence, and breach of implied warranty against Morbark and Garvey Equipment Company (the dealer who sold the chipper to the City of Inglewood), and causes of action for breach of express warranty and fraud against Morbark. Plaintiff also alleged a survival action, seeking property damage and punitive damages against Morbark as Mr. Jimenez's successor in interest. The parties waived a jury, and the case was tried to the court.

### 4.     The Trial Court's Ruling and Rationale

The court applied the risk-benefit standard for plaintiff's design defect claim: the plaintiff must prove the defendant manufactured or sold the product (a point acknowledged in this case); the injured person was harmed while using the product in a reasonably foreseeable way; and the product's design was a substantial factor in causing the harm. If these elements are proven, the plaintiff recovers unless the defendant proves the benefits of the design outweigh its risk. (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430-432; *id.* at p. 431 [the trier of fact "may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design"].)

The parties presented a great deal of testimony on all these points. We need not describe much of it, and will discuss the relevant testimony in the context of the legal discussion, *post*. In the end, the court found Mr. Jimenez was using the wood chipper in a reasonably foreseeable way, but plaintiff did not establish that it was more likely than not that the absence of a knee bar – the only design defect alleged – was a substantial factor in causing Mr. Jimenez's death.

The trial court discussed the causation evidence in considerable detail. After describing the obvious difficulty in designing safety features for a machine whose

7

purpose is to turn trees into wood chips, and the safety features the Morbark chipper did have (the control bar, pull cords, and the feed tray that extended the distance between the operator and the feed wheel), the court described the knee bar, and then continued:

"Because of the lack of any witness to [Mr. Jimenez's] conduct immediately before and at the time he was seen by Stroud already in the feed chute, we can only evaluate the surrounding evidence to determine whether it is more likely than not that a lower control, if present, would have been activated. It does seem more likely than not that a person feeding trimmings into the machine from any location to the rear of the confines of the feed tray who became caught or entangled in a manner that was pulling his body on and into the feed tray would pass over the lower control bar. If that occurred, and if nothing prevented the activation of the lower control, it is probable that it would activate the microswitch and stop the machine."

The court then described factors that could prevent activation of a lower control bar.

First, the court said, "the type, amount and location of trimmings on the feed tray could prevent activation. . . . [S]mall diameter trimmings, if placed in the machine in large bunches, may . . . disperse the pressure caused by an operator entering the feed tray and result in a failure to activate the control bar. In this case, the trimmings were small diameter Chinese elm trimmings (probably no more than an inch in diameter and, in most instances, considerably less) and, as stated, were capable of preventing operation of a lower control bar through dispersal of the operator's weight."

Second, the court observed, "[t]here are also several actions of an operator which would prevent contact with a knee bar such as the movement of the body in an attempt to extricate the operator from whatever had caught him. Also feeding from the side could result in the operator's entry into the feed tray without contact with the bar."

Third, the court continued: "While there are other scenarios as well, a particular one supported by the evidence is that [Mr. Jimenez] entered the feed tray voluntarily, probably to either clear a jam or otherwise to get the trimmings to feed into the feed wheel." (The court explained that smaller trimmings, "such as the ones that were

8

involved in this incident, don't always feed successfully because of their small diameter and the clearance between the wheel and tray." Several procedures can be used to clear jams or other failures to feed, including "feeding additional material, repositioning the trimmings or using other trimmings or a device such as a shovel (which was provided on this job) to push the trimmings into the wheel clearance.")

The evidence supporting the third scenario was the opinion of Morbark's expert, Dennis Brickman, that "the most likely explanation of this accident is that some failure to feed occurred and [Mr. Jimenez] climbed onto the feed tray to manually clear a jam or other failure to feed."

Mr. Brickman's opinion "was based on several factors which the Court believes provide a reasonable basis for the opinion. One was that the trimmings were of a size and nature which don't feed into the machine as consistently as larger and more substantial ones (at least one witness characterized the trimmings in question as 'flimsy') and this is confirmed to some extent by the photos showing trimmings on the feed chute after the accident that had not fed into the machine. . . . The generally insubstantial nature of these trimmings also made it less likely to be able to pull a 145 lb. man ([Mr. Jimenez's] weight), especially one who was actively resisting, into the machine."

A second basis for Mr. Brickman's opinion, "which was of considerable importance, was the testimony of witness Stroud pertaining to the position and location of [Mr. Jimenez] when Stroud saw him. He testified [Mr. Jimenez] was entirely within the confines of the tray and chute with his body at a 30 to 45 degree angle to the right (as viewed from the rear) and lying more on its right side with his right hand or arm caught in the machine." The court found Mr. Stroud's testimony "reasonably clear" that he never saw Mr. Jimenez on the ground or actually feeding trimmings into the chipper, did not see how Mr. Jimenez "got in the position he was in but that his body, including his feet, were within the confines of the feed tray and chute at all times." Officer Coury also testified that Mr. Stroud told him that Mr. Stroud "saw [Mr. Jimenez's] right arm was in the chipper (meaning the feed wheel) and then saw his upper body, which had been elevated, move forward."

9

Mr. Brickman's opinion, based on Mr. Stroud's evidence, was that "Stroud's description of what he saw was more consistent with what would occur to the body of a person who had climbed on to the feed tray in a kneeling position and was then somehow caught by the feed wheel as opposed to one who was pulled from the ground into the machine by some entanglement by the trimmings." The court continued, stating it "doesn't necessarily agree that this is more likely true but does find that this reconstruction is at least as likely as the assumption made by [plaintiff] that [Mr. Jimenez] was pulled in to the machine initially."

The court concluded: "When taken with other possibilities that would prevent activation of a lower control bar, the Court finds that Plaintiffs have failed to establish that it is more likely than not that the absence of a lower control bar was a substantial factor in causing the harm to [Mr. Jimenez]."

The court found plaintiff's evidence, in "a very close call," was sufficient to establish that "it was negligent to not include a readily available safety device that provides added protection against readily foreseeable operating events and resultant harm." But, again, the evidence was insufficient to establish Morbark's negligence was a substantial factor in causing the harm. The court likewise found against plaintiff on the remaining warranty, fraud and survival claims.

### 5. The Hearing on Plaintiff's New Trial Motion

Plaintiff moved for a new or different judgment in plaintiff's favor, and alternatively for a new trial. The court's remarks at the hearing are illuminating.

Addressing plaintiff's counsel, the court observed: "[w]hat you're really saying is, sure, there's a broad range of possibilities, but when you put it all together, the one that is most likely, more likely than not would be the one that Mr. Jimenez was doing exactly what [he was] supposed to be doing, was caught, was unable to extricate himself, and was not able to utilize other safety devices which required voluntary action which is the reason that you needed the knee guard . . . . [¶] But there are others, there are other explanations. [¶] . . . [¶] [T]here was circumstantial evidence in the case which does provide a reasonable basis for expert opinion on each side. And that's what I'm telling

10

you.  This is a very close question because I did not consider Mr. Brickman's reconstruction of what he think[s] occurred to be based on speculation.  I found it to be based on evidence that was before us circumstantially."

After observing that "[s]ome of what [Mr. Brickman] did . . . was not of particularly persuasive value," the court continued:  "But the issue we had to focus on . . . was whether or not the presence of that lower control, what we commonly refer to as the knee bar, but in the absence of that was shown to be more likely than not a substantial factor in causing this accident.  [¶]  And I think it should have been here, I think there should be one.  But in this particular instance, the evidence did not show me it was more likely than not that the accident wouldn't have occurred if it had been there.  It was a very close question.  [¶]  [I]f . . . your evidence causes the scale to tip in the favor of your client in a civil case, you sustain the burden of proof.  [¶]  This was very close, but it didn't [tip the scale] in my weighing the evidence.  Because I thought that the – . . . I was not completely persuaded by Mr. Brickman's opinion as to what he believed occurred, but I thought there was a substantial factual basis in the evidence for the opinion.  And I will say that I overall found his reconstruction to be more persuasive than your experts.  [¶]  In and of itself even with his reconstruction, I nevertheless had doubts and so that was a factor in the decision.  But I still had to look at . . . what value or weight I would give to that opinion compared to my own independent assessment of the evidence in the case, including the assessment of the testimony of their expert, and it was a hugely close question.  [¶]  . . .  [¶]  And in the end [after taking the time to reflect on the decision before filing it] my view on that didn't change."

And further on, the court said that "the evidence presented by all parties in my view is no more speculative than one side than another.  It simply was an attempt to interpret circumstantial evidence. . . .  [¶]  . . .  [¶]  [I]t isn't what [Mr. Jimenez] had been doing in the preceding 29.9 minutes.  The question was what was he, what occurred at this particular time.  [¶]  And in that regard, in balance, I found Mr. Brickman's testimony to be more persuasive."

The court then denied plaintiff's motion, and this appeal followed.

11

## DISCUSSION

### 1.    The Standard of Review

In reviewing a challenge to the trial court's findings of fact – here, causation – we determine only " ' "whether there is any substantial evidence, contradicted or uncontradicted," ' " to support the findings.  (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 366, citations omitted.)  We view the evidence most favorably to the prevailing party, give that evidence the benefit of every reasonable inference, and resolve all conflicts in its favor.  (*Ibid.*)  " 'Substantial evidence is evidence of ponderable legal significance, reasonable, credible and of solid value,' " but " ' "is not synonymous with 'any' evidence." [Citation.]' [Citation.]" (*Ibid.*)  The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.  (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

"Inferences may constitute substantial evidence, but they must be the product of logic and reason.  Speculation or conjecture alone is not substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 (*Roddenberry*).)  An expert's opinion "constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record.  Opinion testimony which is conjectural or speculative 'cannot rise to the dignity of substantial evidence.' [Citation.]" (*Ibid.*)

### 2.    The Challenge to the Expert Testimony

Plaintiff's principal argument is that the trial court erred in relying for its causation finding on the defense expert's testimony.  That testimony, plaintiff says, "was nothing more than pure speculation," and without it, there is no substantial evidence to support the judgment.  The "speculation" plaintiff challenges is the underlying premise of Mr. Brickman's testimony:  that Mr. Jimenez intentionally climbed up on the feed tray and was kneeling in the chipper when he was caught in the feed wheel.

Plaintiff insists there was no evidence to support that premise.  Certainly, there was no direct evidence on the point since no witness saw how Mr. Jimenez got caught in the feed wheel.  But neither was there any direct evidence that Mr. Jimenez was standing

12

on the ground and that his hand got entangled in the brush.  These are both assumptions, or inferences, that may be drawn *if* they are "the product of logic and reason" and not "[s]peculation or conjecture alone . . . ."  (*Roddenberry, supra,* 44 Cal.App.4th at p. 651.)

And so the question for this court is:  Was Mr. Brickman's opinion on how the accident occurred founded only in speculation – because no one saw Mr. Jimenez climb onto the feed tray – or was that a legitimate inference based on circumstantial evidence?

Our answer is the same as the trial court's.  Mr. Brickman's opinion was no more speculative than that of plaintiff's expert, Dr. Richard Ziernicki, who opined that Mr. Jimenez was standing on his feet feeding branches into the chipper when he got caught or snagged.[1]

We now discuss the bases for the two conflicting expert opinions.

### a.  Dr. Ziernicki

When asked what caused Mr. Jimenez to make contact with the feed wheel, plaintiff's expert, Dr. Ziernicki, opined that Mr. Jimenez was standing on his feet feeding branches into the chipper when he got caught or snagged.  "His right hand was caught, entangled and pulled into that – together with the branches, into that infeed wheel which grab[bed] him, crush[ed] [his] hand, and continued pulling body and sending the body towards the cutting drum . . . ."  "[H]e was pulled in because his hand was entangled, pushed, compressed, and pulled into the machine."  When asked what caused "the

---

[1]     Plaintiff emphasizes that the trial court itself found there was no evidence Mr. Jimenez climbed onto the chipper, when it sustained an objection to a question posed to Mr. Jimenez's supervisor, the final witness at the trial.  The supervisor had testified he had never seen Mr. Jimenez crawl into or kneel on the back of a chipper, and was asked on cross-examination, "You wouldn't know particularly what [Mr. Jimenez] climbed on or did or where he went in a given day because you weren't there?"  Plaintiff's counsel objected to the reference to "climbed on," saying there was "no foundation for climbing on anything."  The trial court said, "Well, it assumes something that is not in evidence."  But the same thing is true with respect to plaintiff's claim that Mr. Jimenez's feet were on the ground when he was entangled and dragged into the chipper.  The court sustained an objection to a question to plaintiff's expert, Dr. Ziernicki, that suggested Mr. Jimenez's feet "were still on the ground" when his right hand was entangled, saying, "[t]here's no evidence of that."

mechanical connection between these branches and Mr. Jimenez' hand," Dr. Ziernicki replied: "Look, if you stuck your hand with a bundle of branches into infeed and that infeed will compress the branches because they are three feet away from you, they start compressing, everything goes down, if you get mechanically engaged, . . . that's what will pull your hand." The feed wheel compresses the branches and so does gravity. "If you bring bundle of branches and you dump them in feed tray, they will reconfigure [themselves] and they can grab your hand the same way because of the gravity." The branches "are connected . . . , interacting together. . . . And that interaction, if he got caught in that, he can get very eas[ily] pulled into the machine."

Dr. Ziernicki testified that the biggest of the Chinese elm branches were "maybe inch and a quarter, inch and half some of them," and that he believed "material of that diameter is capable of snagging and pulling [a] 136-pound man, five-and-a-half feet uphill," from the tray to the feed wheel. Dr. Ziernicki calculated that 200 pounds of force would be generated by dragging a 136-pound body over the edge of an infeed tray equipped with a knee bar, which is five times the force necessary to activate the knee bar.

Dr. Ziernicki's opinion that Mr. Jimenez was feeding branches into the chipper with his feet on the ground when he was caught was based on Mr. Stroud's statement to the police (as opposed to his trial testimony); on Mr. Woodson's observation of Mr. Jimenez feeding the wood chipper during the previous 30 minutes; on the fact there was no testimony that Mr. Jimenez was *not* feeding the chipper or was doing something other than his normal work assignment; and on the "physical evidence from the coroner's observations of the body parts being mixed in and entangled with the brush . . . ." The last item "tells me that, yes, he was in process of feeding that chipper."

### b. Mr. Brickman

Mr. Brickman testified: "The essence of what I'm saying here is that the most likely accident scenario is Mr. Jimenez was on the tray table pushing in small material in the body position as described by Mr. Stroud based upon my surrogate study, based upon my previous testing."

14

On direct examination, Mr. Brickman described the bases for his opinion that Mr. Jimenez was "on the tray pushing in material" at the time of his accident:

"It's based upon Mr. Stroud's testimony and in particular that Mr. Stroud saw Mr. Jimenez with his feet forward of the tray table, the rear of the tray table. [¶] [Mr. Stroud] also described Mr. Jimenez's right hand caught in the feed wheel. He also described Mr. Jimenez's body moving forward, his upper torso moving forward. [¶] He also described Mr. Jimenez rolling to his right side on a 30- to 45-degree angle. And that would be consistent with someone on hands and knees pushing with the right hand. And it's like a three-legged chair. If you pull out one of the legs of the chair, then that chair will rotate to the right side, which would be similar to Mr. Stroud's observation of Mr. Jimenez at the time of the accident.

"It's also based on the dummy testing I performed with a Morbark machine where the dummy went flat on his torso into the machine. [¶] It's also based on the Morbark dummy testing where larger diameter brush than what Mr. Jimenez was feeding at the time of the accident did not have a tendency to pull in the dummy and that additional down pressure or force by an operator had to be applied in order to pull in. And that's with a hand tied with a rope to a 'Y' at the rear of the branch with a larger diameter branch than the half-inch to one-inch diameter brush that was being used at the time of the accident. [¶] It's based on the testing that showed on small diameter brush it did not have a tendency to pull in, because it would go underneath the feed wheel and there was not enough force to pull in the material. [¶] It's also based upon Mr. Ortiz's testimony that he previously had witnessed or testified that Mr. Jimenez had reached into the in-feed chute to push in material. And Mr. Ortiz testified that he had done so as well.

"It's based upon my human resistance test, that human beings can pull over 200 pounds on average and compared to the connection test of branches of being nailed to gloves where that resistance is on average about 62 pounds. [¶] It's also based on my surrogate studies where [we] were able to take a gloved right hand and insert it into the Chinese elm branches that were engaged in the feed wheel of an exemplar model 12 Morbark chipper and [we] were able to pull the hand out of the Chinese elm branches

15

on the top of the pile, the middle of the pile, the bottom of pile, left, center, right relative to the in-feed chute. [¶] . . . [¶] . . . It's also based upon my personal investigations of people climbing on the tray table, reaching in with small material to try and get that material to engage."[2]

It seems clear that both plaintiff's and defendants' scenarios are possible, and both are supported only by circumstantial evidence.

Plaintiff argues Mr. Brickman's opinion is speculation because it rested on evidence "created by Mr. Brickman," "contortions of Brickman," and is "not based on the observations of the witness Stroud." We cannot agree with plaintiff's characterizations, except of course that Mr. Stroud did not observe how Mr. Jimenez came to be in the feed chute, a point no one contests. But the trial court specifically cited several reasonable bases for inferring that Mr. Jimenez was kneeling in the chipper and not standing on the ground: Mr. Stroud's testimony about the angle and location of Mr. Jimenez's body, as

---

[2]   On cross-examination, Mr. Brickman summarized this way: "I'm convinced to a reasonable degree of engineering certainty that Mr. Jimenez was climbing on the tray and pushing in material at the time of the accident." "It's based on Mr. Stroud's testimony that he did not see any hooking or any connection between the branches and Mr. Jimenez's right arm. [¶] It's based on all of the studies, the dummy testing, the surrogate studies, the lack of pulling the dummy in on the Morbark machine that you needed down pressure to do it. It's based on the ability to pull your hand out. [¶] It's based on Mr. Ortiz's testimony that it was very rare that he had a snag, maybe approximately three times over the length of his career, and every single time Mr. Ortiz was able to pull his body out. It's based upon all of those factors. [¶] It's based upon the geometry and the fact that had Mr. Jimenez been pulled in, his head and his arm would have been into the feed wheel with his feet still extending behind the tray table and that's not what Mr. Stroud testified to. He was very clear that Mr. Jimenez's feet were behind the rear of the tray table while his right hand was hooked into the feed wheel. [¶] It's based on all of those factors and I'm convinced of it and I've seen it before in other accident investigations that I've done where people have intentionally done that." Dr. Ziernicki, too, when asked if he was "aware of accidents where people voluntarily get up onto the tray, to kneel on it or stand on it, to push material that's inside the chute," replied: "I'm aware that there are people which have done that in the past."

16

Mr. Stroud saw it lying in the wood chipper;[3] the size and nature of the Chinese elm branches that do not feed into the chipper as consistently as more substantial ones; and the generally insubstantial nature of the trimmings that made it less likely they could pull a 145-pound man, particularly one who was actively resisting, into the chipper.[4]  In the end, the trial court found Mr. Brickman's testimony "to be more persuasive" than plaintiff's expert's testimony.

The real thrust of plaintiff's argument is that Mr. Jimenez was an experienced user of tree chippers for over 25 years who would "never climb onto and into a chipper that is operating.  He would never do that to feed a few residual branches [lying] on the chute that he knew would be taken into the chipper upon insertion of the next load of branches.[5] Nobody would do such an obviously dangerous act."

While that argument is persuasive, there was credible evidence that suggested otherwise.  In addition to the expert testimony, there was testimony from Mr. Jimenez's supervisor, Mark Martinez, that the more familiar workers become with a chipper,

---

**3**      Plaintiff also argues that Mr. Brickman based his opinion "on Stroud not seeing [Mr. Jimenez's] feet protruding beyond the edge of the infeed tray," and that the position of his feet "does not prove anything" (because at some point his feet would be within the tray table under any scenario).  That is so, but it does not help plaintiff; Mr. Stroud's testimony on this point was simply consistent with defendant's theory of the accident.

**4**      Plaintiff asserts that, in Mr. Brickman's study showing a surrogate pressing his gloved hand into a pile of Chinese elm branches that were engaged in a feed wheel (to show the ability to pull the hand out), the branches "did not look like the thicker branches shown" in the photographic exhibits from the accident scene.  The testimony plaintiff cites for this proposition supports the opposite conclusion.  Counsel asks:  "[D]id you have any branches that looked like these thicker branches that we've seen here on Exhibit 41 and on Exhibit 16 and in the back of Exhibit 25 or were they all just wimpy, wispy ends?"  Mr. Brickman answered, "No.  They were similar.  They were freshly cut from a Chinese elm."

**5**      There was testimony that when a few branches remain on the in-feed chute, and the operator puts the next pile of branches on the tray, all the material will then be taken into the feed wheel.  Mr. Brickman conceded that this sometimes happens, but testified that sometimes it does not.

"sometimes the workers become lax regarding safety."  And, there was testimony from both plaintiff's and defendants' experts that they had seen similar conduct (getting up onto the feed tray) in the past.

So, while there was no direct evidence Mr. Jimenez was kneeling in the chipper, there was likewise no direct evidence he was standing on his feet when this misfortune began.  Both are suppositions by experts as to how an accident could have occurred, and both are supported by evidence that is entirely circumstantial.  The trial court weighed the evidence with great care, and found that defendants' scenario was "at least as likely" as plaintiff's.  There is no basis in law for an appellate court to overturn that factual finding.

### 3.    The Burden of Proof

Plaintiff argues that even if, as we have found, reliance on the defense expert's opinion was proper, the judgment must be reversed because the opinion was premised on Mr. Jimenez acting unreasonably.  According to plaintiff, the trial court should have placed the burden of proof on defendants to show that Mr. Jimenez climbed onto the chipper.  They reason that "voluntarily climbing into the chipper would constitute negligence on [Mr. Jimenez's] part," and "[a]ccordingly, it was defendant's burden to negate causation by claiming that Mr. Jimenez was negligent."

Plaintiff cites Evidence Code section 521.  That section says that "[t]he party claiming that a person did not exercise a requisite degree of care has the burden of proof on that issue."  Plaintiff further cites the Supreme Court's explanation:  "The burden of proof rests on each party to a civil action as to each fact essential to his claim or defense (§ 500).  A party claiming a person failed to exercise due care has the burden of proof on that issue (§ 521).  The burden of proving all aspects of the affirmative defense of contributory negligence, including causation, rests on the defendant . . . ."  (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 503.)

The principles cited are, of course, correct, but they do not apply here.  As defendant Garvey Equipment points out, the parties "never asked the trial court to attribute negligence to [Mr.] Jimenez," and the trial court did not do so.  Defendants contended there was no design defect, and if there was, it was not a substantial factor in

18

causing the accident – both elements of plaintiff's case that plaintiff had to prove. As defense counsel said in closing argument, "My defense is this. It's his burden of proof."

In short, this was a matter of accident reconstruction, not a matter of proving Mr. Jimenez was negligent. Defendants were not required to prove that Mr. Jimenez climbed up on the chipper – they were simply showing that the evidence was consistent with his having done so, and that other workers familiar with the risks of operating a wood chipper have been known to do so. (Indeed, the trial court found the evidence sufficient to establish that Mr. Jimenez's "use of the chipper was reasonably foreseeable regardless of which side's interpretation of how the accident occurred is found to be most likely.")

Plaintiff had the burden to prove a knee bar would have prevented the accident, and did not do so. This was because, in the trial court's view, defendants' reconstruction of the accident was "at least as likely as the assumption made by the Plaintiffs that [Mr. Jimenez] was pulled in to the machine initially," and "[w]hen taken with other possibilities that would prevent activation of a lower control bar," plaintiff failed in her burden of proof. Indeed, the court found Mr. Brickman's reconstruction to be more persuasive than Dr. Ziernicki's. In short, there was no discussion of contributory or comparative negligence, and no reason to discuss it. Plaintiff cannot reverse the burden of proof by attributing to defendants an affirmative defense the trial court had no reason to consider.

Finally, plaintiff contends there are "strong policy justifications" for placing the burden of proof on defendants to show Mr. Jimenez voluntarily climbed into the chipper. Plaintiff contends the absence of causation evidence is due to defendant's wrongful conduct (as found by the trial court) in failing to incorporate a knee bar in the chipper, so defendant should have the burden of proving the accident was not caused by the absence of a knee bar. Plaintiff reasons that if a knee bar had been present, either the accident would have been averted or Mr. Jimenez's death would be strong evidence he climbed into the chipper. But this is circular thinking that takes us nowhere: if there had been a knee bar, plaintiff would have no claim for defective design. Also, there were other

19

scenarios (in addition to climbing on the chipper) under which a knee bar might not have been activated, described by the trial court in its decision (see *ante*, at pp. 8-9).

Plaintiff relies on two cases where the courts shifted the burden of proof on causation based on policy considerations. The shift in the burden of proof "rest[s] on a policy judgment that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was *not* a cause of the injury." (*Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 774, fn. 19 (*Haft*).) That principle does not apply here, and neither case suggests that it should.

In *Haft*, the defendants violated a statute requiring them to provide a lifeguard at a hotel pool, where a father and son drowned and no witnesses observed the drowning. The court held the failure to provide lifeguard services shifted to defendants the burden to prove their violation was not a cause of the deaths, and in the absence of such proof, defendants' causation of the deaths was established as a matter of law. (*Haft, supra,* 3 Cal.3d at p. 769.)

Among other things, *Haft* observed that "the paucity of evidence on causation is normally one of the burdens that must be shouldered by a plaintiff in proving his case . . . ." (*Haft, supra,* 3 Cal.3d at p. 771.) But in *Haft*, the evidentiary void resulted "primarily from defendants' failure to provide a lifeguard to observe occurrences within the pool area," and deprived the plaintiffs "of a means of definitively establishing the facts leading to the drownings." (*Ibid.*) The court observed, "Clearly, the failure to provide a lifeguard greatly enhanced the chances of the occurrence" of the drownings. (*Id.* at p. 772.) The plaintiffs proved negligence in failing to provide a lifeguard, and proved the available facts "at the very least, strongly suggest that a competent lifeguard . . . would have prevented the deaths," so they had gone "as far as they possibly can . . . in proving the requisite causal link . . . ." (*Ibid.*) To require the plaintiffs to establish proximate causation "to a greater certainty than they have . . . would permit

20

defendants to gain the advantage of the lack of proof inherent in the lifeguardless situation which they have created." (*Ibid.*) Under those circumstances, the burden of proof on causation "should be shifted to defendants to absolve themselves if they can." (*Ibid.*)

This case is not like *Haft*. Unlike *Haft*, there was no violation of a statute intended to prevent the very injury that occurred. Unlike *Haft*, the available facts did not "strongly suggest" that a knee bar would have prevented Mr. Jimenez's death. Unlike *Haft*, the lack of proof of causation is not "inherent" in the absence of a knee bar (as it was in the lifeguardless situation). Unlike *Haft*, the "absence of definite evidence on causation" is not "a direct and foreseeable result of the defendants' negligent failure to provide" a knee bar. (*Haft, supra,* 3 Cal.3d at p. 773.) Indeed, in *Haft* the court observed that "this record comes very close to, and may well succeed in, establishing that the absence of a lifeguard was an actual cause of the deaths as a matter of law even without a shift in the burden of proof . . . ." (*Id.* at p. 772, fn. 18.) This is not such a case.

Nor is this a case like *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417 (*Galanek*). That was a legal malpractice case where the plaintiff alleged the defendant's negligence – failing to preserve the car in which the plaintiff was injured – caused her to lose a meritorious product liability case against the car's manufacturer. (*Id.* at p. 1420.) In *Galanek*, the defendant was "undeniabl[y] negligen[t]" (*id.* at p. 1425) and that "very act of professional negligence" was "what made it impossible for [the plaintiff] to prove causation . . . ." (*Id.* at pp. 1426, 1428.) Consequently, "the most desirable result in terms of public policy is to hold [the defendant] liable rather than deny recovery to [the plaintiff], unless [the defendant] can prove his negligence did *not* cause [the plaintiff] to lose a meritorious action." (*Id.* at p. 1427.)

*Galanek* tells us (as did *Haft*) that a plaintiff must establish a "'substantial probability' of causation as a condition precedent to a shift in the burden of proof." (*Galanek, supra,* 68 Cal.App.4th at p. 1427.) That factor is entirely missing here, where Morbark's failure to install a knee bar is *not* "what made it impossible for [the plaintiff] to prove causation" (*id.* at p. 1426), and indeed even the fact of Morbark's negligent

21

design was "a very close call." So this is not a case of a defendant "'tak[ing] advantage of his own wrong'" (*id.* at p. 1428, quoting Civ. Code, § 3517); it is a case where plaintiff "failed to establish a significant probability of causation between [the] defective product" and the accident, and "hence the burden of proof did not shift . . . ." (*Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 928.)

### 4.    Conclusion

In the end, recognizing that this case involves a tragic accident, nonetheless we cannot accept plaintiff's argument that Mr. Jimenez must have been feeding the chipper in the way he was trained to do when that misfortune occurred. Evidence credited by the trial court supported the inference that Mr. Jimenez was kneeling on the chipper at the time (and there were "other possibilities that would prevent activation of a lower control bar"). As we have explained, this is not a case where we can shift the burden of proof to defendants. And while the trial court was not "completely persuaded" that events occurred as Mr. Brickman posited, the court thought there was a "substantial factual basis" for that scenario, and that it was "at least as likely as the assumption made by the Plaintiffs that [Mr. Jimenez] was pulled in to the machine initially." Consequently, plaintiff failed to carry her burden of proof on causation. (See *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1373 ["[a] product liability case must be based on substantial evidence establishing both the defect and causation (a substantial probability that the design defect, and not something else, caused the plaintiff's injury)"].)

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.


GRIMES, J.

We concur:


BIGELOW, P. J.               RUBIN, J.


22